```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3   CASCADES STREAMING TECHNOLOGIES,  )  Docket No. 13 C 1455
     LLC,                              )
 4                                     )
                         Plaintiff,    )  Chicago, Illinois
 5                                     )  April 14, 2015
                    v.                 )  9:30 a.m.
 6                                     )
     BIG TEN NETWORK, LLC,             )
 7                                     )
                         Defendant.    )
 8

 9           TRANSCRIPT OF PROCEEDINGS - Markman Hearing
                BEFORE THE HONORABLE THOMAS M. DURKIN
10

11   APPEARANCES:

12

13   For the Plaintiff:     NIRO HALLER & NIRO LTD. by
                            MR. JOSEPH N. HOSTENY III
14                          MR. ARTHUR A. GASEY
                            181 W. Madison Street
15                          Suite 4600
                            Chicago, IL 60602

16

17   For the Defendant:    COZEN O'CONNOR by
                           MR. MARTIN B. PAVANE
18                         MR. ADAM J. SCHLATNER
                           277 Park Avenue
19                         New York, NY 10172

20   Also Present:         MR. MARK MAGAS
                           MR. DANIEL SCHATZ
21

22   Court Reporter:       LAURA R. RENKE, CSR, RDR, CRR
                           Official Court Reporter
23                         219 S. Dearborn Street, Room 1432
                           Chicago, IL 60604
24                         312.435.6053
                           laura_renke@ilnd.uscourts.gov
25
```

1          (In open court.)

2               THE COURT:  All right.  Let's call it, see if everyone

3     is here.

4               THE CLERK:  13 CV 1455, Cascades Streaming

5     Technologies.

6               MR. PAVANE:  Yeah, we're all here.  They're in the

7     back.  I'll get them.

8               THE COURT:  Do we have -- before we -- do we have both

9     sides?

10              MR. PAVANE:  Yes, everyone.

11              THE COURT:  Okay.  Why don't you set up.  I'm going to

12    go get my papers, and then we'll begin.

13         (Pause in proceedings.)

14              THE CLERK:  All rise.

15              Please be seated.

16              THE COURT:  All right.  Please call the case.

17              THE CLERK:  13 CV 1445, Cascades Streaming

18    Technologies, LLC.

19              THE COURT:  Okay.  Let's have everyone identify

20    themselves for the record.

21              MR. HOSTENY:  Good morning, your Honor.  Joe Hosteny

22    and Art Gasey on behalf of Cascades.  And also present with us

23    is Mark Magas, M-A-G-A-S, of Cascades.

24              THE COURT:  Very good.  All right.

25              And for the defendant.

1          MR. PAVANE:  Good morning, your Honor.  Martin Pavane

2     of Cozen O'Connor on behalf of the defendant, BTN, Big Ten

3     Network.  With me from my firm is Adam Schlatner, and also

4     present is Dan Schatz, who is with the client.

5          THE COURT:  All right.

6          Okay.  Let's have everyone take a seat.

7          We are expecting no witnesses at this hearing,

8     correct?

9          MR. HOSTENY:  Correct.

10         THE COURT:  Okay.  And I've reread your briefs and

11    reread the tutorial you gave me.

12         I guess I have a couple questions up front, and then

13    I'll take suggestions on how you want to proceed.

14         First, is -- I may have asked this last time.  Is

15    Cascades suing anyone else in other courts?

16         MR. HOSTENY:  No, your Honor.

17         THE COURT:  So this is the only suit where these

18    claims are being construed?

19         MR. HOSTENY:  Correct.

20         THE COURT:  Okay.

21         And then this is more a general question, which may

22    reveal my ignorance on some of the patent -- some of the areas

23    of law you practice in regularly.

24         What's the order of importance of the various sources

25    for claim construction?  I understand typically I'm supposed to

1    go with intrinsic evidence first, and then if -- failing that,

2    go to extrinsic evidence.

3              MR. PAVANE:  I think that's exactly right, your Honor.

4              THE COURT:  Okay.  And then within intrinsic evidence,

5    I look at the claim terms themselves, try and give them their

6    plain and ordinary meaning.

7              If -- failing that, I look at the -- and that's plain

8    and ordinary meaning to someone skilled in the art, correct?

9              MR. HOSTENY:  Correct, yes.

10             THE COURT:  Okay.  Failing that, I then look at the

11   spec.  And if I still need to keep looking, I look at the file

12   wrapper, the file history.  Or do I look at all three together?

13             MR. HOSTENY:  Well, you can look at all three, your

14   Honor, because at -- *Phillips* is probably -- *Phillips v. AWH* --

15             COURT REPORTER:  Could you grab a microphone, please.

16             MR. HOSTENY:  Sorry.

17   *Phillips v. AWH* would be the best guide on intrinsic

18   is ahead of extrinsic.

19             THE COURT:  Right.

20             MR. HOSTENY:  And in intrinsic, the hierarchy is the

21   claims construed in light of the specification, the file

22   history, but the file history is generally regarded as on the

23   bottom rung of those three.

24             THE COURT:  All right.

25             Do you agree, Mr. Pavane?

1            MR. PAVANE:  I generally agree, with the following

2      caveats.  Number one, oftentimes there is an express definition

3      in the specification.  And when there's a definition, that

4      controls, regardless of what you might have concluded the

5      ordinary meaning was on the claim term.

6            THE COURT:  Okay.

7            MR. PAVANE:  Secondly, in the prosecution history,

8      oftentimes there are statements made that will, as the Federal

9      Circuit has put it, disavow a particular construction that you

10     might otherwise think would be applicable.

11           So to distinguish over art, for example, or some other

12     reason to support patentability, a patent applicant might make

13     an argument during prosecution history that will inform the

14     meaning of a claim.

15           THE COURT:  Right.  That's the estoppel issue.

16           MR. PAVANE:  Yes, sir.

17           THE COURT:  Okay.  Do you agree, Mr. Hosteny?

18           MR. HOSTENY:  Generally speaking, yes, your Honor.

19           THE COURT:  Okay.  And this is not meant to be binding

20     on anything.  I'm just trying to make sure I generally

21     understand the framework.

22           MR. HOSTENY:  The only thing, disavowal has got to be

23     clear and unmistakable is the general rule.

24           THE COURT:  Right.  Okay.  Understood.

25           And extrinsic evidence I could hear from witnesses; I

1    could, as you've both done, consult with dictionaries,

2    publications, a variety of sources.  But that's a secondary

3    source if I can't come up with something that is clear from the

4    intrinsic evidence.

5                    MR. HOSTENY:  That's correct.

6                    MR. PAVANE:  That's correct, your Honor.  I would

7    agree with that, again, with the one caveat that the Federal

8    Circuit has indicated that of those various extrinsic sources,

9    the one that I guess is at the top of the list, as you put it,

10   would be the technical dictionaries, and others are a little

11   more remote than that.

12                   THE COURT:  Okay.

13                   MR. PAVANE:  But they're all extrinsic.

14                   THE COURT:  In the extrinsic area.

15                   MR. PAVANE:  Yeah.  Only in the extrinsic area, yes.

16                   THE COURT:  Got it.  Okay.  Good.  All right.  So I

17   think I understand the framework.

18                   Now, I have not had a *Markman* hearing since I've

19   become a judge.  I had a few as a lawyer, but that was a while

20   back, and it appeared that every judge that did it did it

21   differently.  So what would you suggest?  I don't know if

22   you've talked about how you want to proceed.

23                   The one thing I would suggest is I think we go term by

24   term rather than plaintiffs go first on everything and then

25   defendants go next on everything.  That's not going to be

 1    helpful to me.  I think a claim term or phrase, plaintiff

 2    first, then the defendants, and then, if need be, a reply and

 3    then we move to the next one would probably, in my mind, at

 4    least, make the most sense.  But I'm open to suggestion.

 5           MR. HOSTENY:  Term by term is fine with the plaintiff,

 6    your Honor.  I think that's a good idea.

 7           MR. PAVANE:  Agree.

 8           THE COURT:  Okay.  And plaintiffs -- how do you want

 9    to go then?  The brief had the defendants going first rather

10    than the plaintiffs.  And I'm happy to go that route, or if

11    you've got another suggested way of going.  Everyone will get a

12    fair chance to talk, so it's not going to be --

13           MR. GASEY:  The only thing I'd point out, your

14    Honor -- and I just looked very quickly at Big Ten's

15    presentation.  Our presentation does have the benefit of -- I

16    believe for all the terms, we actually set out in our slides

17    what their construction is and ours.  So perhaps as a point of

18    reference, it might make sense for us to go first.

19           MR. PAVANE:  I think we -- I think we do the same.

20           MR. GASEY:  Oh, do you?  I didn't see it.

21           THE COURT:  All right.  Well, I'm indifferent.

22        (Counsel conferring.)

23           MR. PAVANE:  Your Honor, at the end of the day, I

24    wouldn't have a problem with them going first.

25           THE COURT:  Okay.  Fair enough.  We'll let the

1    plaintiffs go first.

2         Do you both have slides?

3         MR. HOSTENY:  We did.

4         THE COURT:  Oh.  What happened?

5         MR. HOSTENY:  We're using the -- we're going to use

6    the ELMO now because we had some technical problem hooking up a

7    laptop.

8         THE COURT:  Fine.

9         MR. HOSTENY:  So we've got -- as soon as we switch

10   over on the input, we'll have our paper presentation.  I've

11   given three copies for the Court, and our colleagues on the

12   defense side have some copies of it as well.  That's it right

13   there.

14        THE COURT:  Oh, fine.  Okay.

15        Well, I don't know that we need -- well, you can put

16   it up there, I guess.  If I've got a -- and I've got a screen

17   in front of me.  That's fine.

18        Okay.  And Big Ten has a similar set of slides?

19        MR. PAVANE:  Yes, sir.

20        THE COURT:  Okay.

21        MR. PAVANE:  Do you want us to hand it up now, or

22   would you rather --

23        THE COURT:  No.  When you give your presentation, you

24   can hand it up at that time.

25        MR. PAVANE:  Okay.  Thank you.

1    THE COURT:  Okay.  What I wouldn't mind, five minutes

2    max from each of you, unless it's part of your claim

3    construction presentation, is a bit of a refresher on the

4    tutorial.  But if it's part of your claim construction slides,

5    that's fine.

6    MR. HOSTENY:  Thank you, your Honor.  We do have a

7    little bit from our -- a couple of slides from our tutorial

8    here.

9    THE COURT:  That's fine.  Okay.  Well, then we'll

10   proceed that way.

11   MR. HOSTENY:  All right.  The first one here, as you

12   might recall from -- I'll use this microphone here.

13   You might recall from the tutorial that we have a

14   variety of kinds of connections that users can have with the

15   Internet:  They can have a smartphone, they can have a PC or a

16   laptop that's got a wireless connection to the Internet, or

17   they can have a PC or a laptop that has a wired connection to

18   the Internet.

19   And generally the wired connection is the fastest, and

20   the smartphone is generally the slowest, although there can be

21   a lot of overlap of the smartphone because it can have a

22   wireless connection or a connection over a cellular telephone

23   network.

24   What we've shown here is the cellular connection to

25   the Internet, which would be the slowest one.  So you've got --

1    one of the things that you're dealing with in this technology

2    is that the kind of device a user has can vary and that the

3    kind of connection a user has can vary.  So that's one of the

4    problems.

5            THE COURT:  Explain bandwidth to me.  Is that the --

6    well, it means different things in different technologies.  But

7    in this technology, explain what you mean.

8            MR. HOSTENY:  Well, bandwidth is bits per second.

9    It's essentially how much data can be pushed through a

10   connection in a given amount of time, usually expressed in bits

11   per second, sometimes megabits per second, sometimes bytes.

12           Bytes are 8 bits.  So what we're talking about here is

13   just megabits per second.  You might have -- over a cellular

14   connection with a telephone, you might have a few hundred

15   thousand bits per second.  Over a good wired connection with --

16   between a PC wired to the Internet over a network, you would

17   have -- you know, you might have 20 megabits per second, so you

18   might have a factor of 10 or 20 difference in speed.

19           So it's just the number of data bits that you can push

20   through in a given period of time.

21           THE COURT:  All right.

22           MR. HOSTENY:  And then our second -- another of our

23   slides from our tutorial was the client-server relationship.

24   The server is simply a computer that provides a service of some

25   kind.  It can provide -- you know, we've all got print servers

1    on our networks.  That's how printers print.

2           We've got -- in this case, we've got servers that will

3    provide video or audio files over the Internet.  The Internet

4    is generally depicted as a cloud because the pathways can vary

5    a great deal inside the cloud.  It really doesn't matter as far

6    as the server is concerned or as far as the client is

7    concerned.  You can go through a variety of paths and even use

8    a combination of servers within the cloud.

9           Then on the client side, you have the user device,

10   which is -- at the bottom is the smartphone or at the middle

11   might be something like an iPad or an Android tablet.  Then

12   at the top, you have the desktop PC, which may be connected

13   either by a wired or a wireless connection to the Internet.

14          So you have the client side and the server side is the

15   normal terminology.

16          And then the -- another slide from our tutorial shows

17   the difference in camera angles that you can get by switching

18   between different video feeds or video files from, and then you

19   have one, two, three, four different possible views:  Here's

20   somebody at bat, somebody talking to a coach, somebody in the

21   dugout, somebody on the base.

22          And then you represent what's going on here.  It

23   progresses across from left to right in a series of frames.

24          And if a switch is desired from one camera angle to

25   another camera angle, it occurs at the red band with the yellow

1   bar.  Those are key frames, and that's where a switching

2   occurs.

3            These other red bars are key frames, but no switching

4   is occurring unless there's a yellow line in it.  So up at the

5   top, we get to a key frame here, and we switch from Camera 1 to

6   Camera 2.  And we continue on through a bunch of frames for a

7   while, and then we decide to switch all the way down to

8   Camera 4.  And we continue on with frames for a while, and then

9   we switch back up to Camera 3 and continue on.

10           Every time the switch occurs at a key frame -- and the

11   reason for that is because in the series of frames, you might

12   recall we had a picture of a cloud in the sky and a blue sky in

13   successive frames.  Well, if you send two frames and they both

14   have the blue sky, you don't have to repeat the blue sky in the

15   second frame.  You only have to repeat whatever happens to be

16   new, and that's the cloud that appeared in the sky in our

17   tutorial.

18           And the key frame is going to be -- it's going to be a

19   complete frame because when I switch from one camera angle to

20   another here, if I'm on Camera 1, for example, and I go to

21   Camera 2, this -- these frames don't correlate to these.  And I

22   have to start off fresh with a new key frame that's complete so

23   I have full knowledge of what the picture should look like

24   because the past frames in one stream aren't known to the other

25   streams, as it were.

1        The other way that you can change video signals is you

2   can change what's called the bit -- the bit rate.  You can use

3   a lower or a higher bandwidth as you go down the side here.

4   You have higher and higher resolution, which requires more bits

5   per second.

6        And the smartphone connection might not be capable of

7   more bits per second, or you might -- your smartphone, you

8   might be on the telephone with it, the cellular network, and

9   you might go into an airport with a hotspot, a wireless

10  hotspot.  And all of a sudden it's got a better connection and

11  it can see better video.

12       So just as you can switch camera angles from our

13  tutorial, you can also switch bit rates, which give you

14  progressively from fairly blurry here to a little sharper to a

15  little sharper to the best.

16       And, again, you're switching at a key frame, going

17  from one resolution -- the poorest here -- to the next

18  resolution.  And then, for example, maybe your cellular

19  telephone got to a hotspot and now you're on a wireless

20  connection, so you get the best connection.  And then you walk

21  away a little distance and it's a poorer connection, and you go

22  back and switch to a lower bit rate.

23       So the idea of the -- the idea of the invention is

24  to -- and here's our first slide here.  This is just Figure 2

25  from the patent.

1          This is a little more elaborate view of what the

2    invention is about.  To the right of the dotted line over on

3    this side, you have the equipment that provides the service.

4    This is the server side.  You're going through the Internet.

5    And over here is the user side and the equipment that provides

6    what the user sees on the video window here.

7          And there's a connection there where the user can make

8    requests to change -- for example, can ask for a different -- a

9    different bit rate.

10         But the controlling is going on here.  You have this

11   feed distributor, which is just a computer.  And the feed

12   distributor is getting at the same time -- in this example

13   here, it's getting an audio file, just one of them.  But it

14   also has three different video files -- well, one, two, up to N

15   video files.  It has a number of video files or video feeds

16   that it's getting at the same time.

17         And it will decide which one to give to the streaming

18   server.  That's another computer.  And these can be two

19   different computers or the same as far as the invention is

20   concerned.

21         And then the streaming server sends that over to the

22   client, gets processed over here, and ultimately shows up in

23   the video window.

24         And the idea of streaming is I don't have to transfer

25   the whole thing to the client, the entire movie or the entire

1    game, in order for it to be seen.  I transfer it as it's

2    occurring.  And there is a little what's called buffer on the

3    client side, which stores a portion of it in case there's a

4    temporary interruption of some kind.

5             But essentially it's being played as it occurs.  So

6    you have a video file and an audio file going to the feed

7    distributor.

8             THE COURT:  What is a feed distributor?  It's simply

9    another server, isn't it?  Or is it a computer?

10            MR. HOSTENY:  It's another computer.  And its job is

11   to take a request for a different bit rate or a different

12   camera angle or a different point of view and then select the

13   appropriate camera angle or point of view.

14            There's another exchange that goes on here between

15   this side and this side, which really doesn't come up in the

16   claim construction hearing.  But there is data that's exchanged

17   between the two sides about what's available.  Okay?

18            Sometimes it's called a manifest file; sometimes it's

19   called an XML file.  But this side, the server side, will tell

20   the client, "Here's what you can get from us."  And it will

21   give the technical information to the client side so the client

22   can say, "Okay.  I want this different camera angle," and it

23   sends the appropriate information from the left side over to

24   the right side, the feed distributor, because you see that's

25   where the connection is where you have arrows going both ways.

1          And the feed distributor will then operate in

2     accordance with that and control or determine which file the

3     streaming server is going to be sending back to the client.

4          THE COURT:  What is 21 and 30?

5          MR. HOSTENY:  21?  Wait a minute.  Let me find the

6     numbers.

7          THE COURT:  It's the feed --

8          MR. HOSTENY:  Oh.  Those are essentially gateways.  I

9     think they call them proxies or stubs between each side and the

10    Internet.  And I can get you a little more information on that

11    one, but I'll have to talk to Mr. Magas.

12         THE COURT:  Okay.  But the client communicates with

13    the server side through this line 16?

14         MR. HOSTENY:  GUI manager.

15         THE COURT:  GUI manager?

16         MR. HOSTENY:  Yeah, be at 21, the proxy or the stub,

17    whatever it's called, and then it goes over to the feed

18    distributor.  So the client can communicate with the feed

19    distributor, and the feed distributor can send information to

20    the client as well.

21         THE COURT:  Oh, okay.

22         MR. HOSTENY:  Okay?  So there's more than just

23    streaming going on here; there is an exchange of information

24    going on as well.

25         THE COURT:  Okay.

1        MR. HOSTENY:  So the client can say -- I think you may

2    remember during the tutorial, we were showing a BTN site.  I

3    think we were showing a basketball game.  And there was a gear

4    or something you could click on, and up would pop a little

5    dialogue box, and it would say, "Here are the different bit

6    rates that you can get."

7        And the client could select one of those faster or

8    slower bit rates and get either a clearer or blurrier picture,

9    send that instruction back to this feed distributor.  The feed

10   distributor would say, "Oh, I've been asked for File No." --

11   "File No. 2 or Live Source No. 2," and I send that one -- and I

12   tell the streaming server to stream that to the client side.

13       So that little exchange of information is what's in

14   the dialogue box that tells the user, "Here's what's available

15   to you."  And the feed distributor knows what's available, and

16   they can communicate with each other.  And then the feed

17   distributor computer can instruct the streaming server

18   accordingly, send the right thing over to the client, whatever

19   it is that the client happened to want.

20       But the actual controlling is going on over here

21   because this is the side that knows where the key frame is

22   going to pop up.  The user has no idea where a key frame is.

23   You might recall there was just a brief delay, and then the

24   picture would get sharper:  The volleyball net would be

25   clearer, or the basketball uniforms would be sharper.

1          But there would be a moment until that occurred.  But

2     it would be a smooth switch.  You wouldn't see a big jerky

3     movement.  You wouldn't have No. 20 on one side of the court

4     and then all of a sudden on the other side of the court or the

5     ball in one place and then the ball several feet away.  It

6     would be a smooth switch.

7          There's just kind of a bit of a resummary of our

8     tutorial.  You know, it's sporting events, concerts, shows,

9     live action.  That's why the patent refers to live feeds.

10          Different kinds of user devices.  We've gone over

11     that.

12          Connections of different speed and quality, different

13     megabits per second depending on whether it's wired, wireless,

14     or cellular.

15          And then smooth switching.  Here's the field of the

16     invention:  "The present invention," blah, blah, blah.  "More

17     specifically, the invention relates to an audio-video data

18     switching and viewing system which allows viewing and smooth

19     remote switching from one video signal to another or from one

20     audio signal to another."

21          And it's important to keep in mind the word "signal"

22     when we get to this business about point of view.

23          These are just the claims that are asserted in the

24     amended complaint.  We've got basically two groups of

25     independent claims and then some dependent claims that come off

1    of each of the independents.

2            And you probably recall the independent claim can

3    recite elements A, B, C, and D, and the dependent claim can add

4    E.  So the dependent claim has A, B, C, D, and E; and its

5    parent, as it were, only has A, B, and C or A, B, C, and D.

6    Doesn't have all the same elements.

7            Here --

8            THE COURT:  So the dependent claim can contain more

9    elements than the independent claim?

10           MR. HOSTENY:  Yes.  The role of a dependent claim is

11   to add an element or elements or a step or steps to the

12   independent claim.

13           So if I had -- you know, if I had a claim to an

14   automobile with doors and a means for propulsion or a

15   propulsion system, I could have a dependent claim that says the

16   propulsion system is a diesel engine or a gasoline engine or an

17   electric motor, for example.  Okay?

18           Or I could have a claim to a car with a plurality of

19   wheels, so it's got to have two or more; and I could have a

20   dependent claim that would say it has four wheels or it has

21   three wheels or it has wheels with rubber tires on them.  So

22   you add details with dependent claims.

23           And typically dependent claims are less vulnerable to

24   prior art challenges, invalidity challenges.  But from the

25   infringement side, you have to prove the existence of an

1    additional element or step in the defendant's device.

2          Here's claim 16.  You've got a plurality of audio and

3    video sources, a streaming server -- a streaming server -- and

4    I should have highlighted "separate sessions" here, but I

5    didn't -- with the plurality of users.

6          One of the video files -- just a video file in this

7    case -- has to have a key frame and a feed distributor.  And

8    what the feed distributor does is controllably feeds the first

9    audio and first video file to the streaming server, and feed

10   distributor can receive instructions from a user.  That's what

11   we're talking about that communication back and forth.

12         And the video files are compressed before streaming,

13   they include key frames, and the switch occurs when a key frame

14   is encountered.  So that's a system claim.

15         17 is an analogous method claim where you have a

16   series of steps rather than an apparatus with some particular

17   structures defined in it.

18         Claim 18 is another method claim.  And I think these

19   claims, you'll note they don't always share -- for example, if

20   you look at claim 17, you'll see "interleaved."  You'll see

21   "interleaved" in claim 18.

22         You will see "key frames" in claim 17.

23         But you won't see "key frames" in 18.  In other words,

24   with respect to claim 18, the "key frame" step is added in a

25   dependent claim on the next chart here.

1    You've got three dependent claims from claim 18.  One

2    of them says you continue to stream the same audio file.  The

3    next one says you can stream a different audio file.  And the

4    third dependent claim says the switch occurs at a key frame of

5    the video.

6         So the claims vary in terms of what they call for in

7    terms of structure and steps, and they also vary in that all of

8    the -- you won't find that all of the claims have all of the

9    terms we're discussing today.  Some claims have some of the

10   terms; other claims have others of the terms.  Like

11   "persistent" doesn't come up until you get to the later claims.

12        So in any event, we've got 16, 17, and 18, some

13   dependent claims.  I'm going to skip over those.

14        Claim 22.  This has got "interleaved," and this has

15   got "different from."  And I don't think this one says anything

16   about -- refers to a "session manager," but it doesn't refer to

17   a "key frame" in claim 22.

18        Yeah, that's in claim 25.  Again, that's added by a

19   dependent claim.  The feed distributor is told to switch at a

20   key frame.

21        Claim 26 is a couple of different terms that the

22   parties are discussing in their briefs.  And one of them is

23   what's a "persistent connection."  That's what I have

24   highlighted in yellow.

25        And the other is the phrase "without using the

1  bandwidth of the streaming session."

2  There's bandwidth that's associated with the streaming

3  session in the connection, but there's also some bandwidth used

4  that can be used to transmit back and forth data about what

5  connections are available, what views are available, what audio

6  files are available, and what it is that the user would like to

7  see.  So there's kind of like two things that can go on there

8  at the same time.

9  Claim 28 is fairly similar.  You know, the general

10  principle is is that a patent can include a number of claims

11  and that the inventor can define the invention in different

12  ways.  And that's the way it was done here, with different

13  claims.

14  And 22 and -- I'm sorry.  26 and 28 also refer to

15  multimedia files.  Multimedia files are movies, video with

16  audio typically, more than one kind of media in them, typically

17  both visual and audio.

18  THE COURT:  Any construction of a claim term is going

19  to be -- if I do it for one particular claim, it would apply to

20  all claims, correct?

21  MR. HOSTENY:  Generally speaking, yes.  That's the

22  case.

23  THE COURT:  And do you agree on the Big Ten side?

24  MR. PAVANE:  I agree with that, yes.

25  THE COURT:  Okay.  All right.  I mean, it makes

1    logical sense.  I was hoping logic prevailed.

2           MR. HOSTENY:  Okay.

3           MR. PAVANE:  I will just interrupt and say I'm aware

4    just Federal Circuit there is one case I've read actually where

5    a Court applied different constructions to the same term in the

6    same patent, but they explained that it was due to the

7    particular peculiarities of the file history in that case.  I

8    don't believe that applies here.

9           THE COURT:  Okay.

10          MR. HOSTENY:  I agree.  I am aware of one case, but

11   that's the exception rather than the rule.  And I don't think

12   it's going to be the case here.

13          THE COURT:  Okay.

14          MR. HOSTENY:  One brief chart here about some words

15   that I wanted to point to that BTN is using that, generally

16   speaking, with some -- don't appear in the claims except in a

17   dependent claim when you get to the "point of view."

18          And typically the -- you know, the defendant's

19   strategy I think is what we say here in green:  The idea is to

20   get a claim construed in a way that will lead to a

21   non-infringement position or an invalidity position from which

22   the defendant, you know, can launch a summary judgment attack

23   on the case and hopefully win the case based on a summary

24   judgment that the claim or claims were invalid because the

25   prior art shows everything or the defendant's device doesn't

1    infringe.  Case is over if the defendant is able to do that.

2          THE COURT:  Right.  I mean, is it a general

3    proposition that the patentee is going to -- often has to

4    narrow their invention to overcome prior art?

5          MR. HOSTENY:  Sometimes you do.

6          THE COURT:  And then the defendant's view will be that

7    then you try and expand the claims or the scope of the claims

8    after you've gotten the patent to capture the infringing

9    product.

10         MR. HOSTENY:  That's one strategy.  They can either

11   try to broaden the claims if they think they have good prior

12   art so they can invalidate it.

13         THE COURT:  Okay.

14         MR. HOSTENY:  Or they can try and narrow the claims so

15   they can say, "Well, we have A, B, C, and D, but don't have E."

16         THE COURT:  Right.

17         MR. HOSTENY:  Or "We have A, B, D, and E, but don't

18   have C."

19         THE COURT:  So and that's a defense strategy.

20   Plaintiff's strategy would be to make -- to -- once you get it

21   patented to try and expand the claims if possible -- well,

22   depending on whether you're going to run into prior art --

23         MR. HOSTENY:  Right.

24         THE COURT:  -- expand the claims to cover the

25   infringing product or expand it just far enough not to be

1    anticipated or obvious but, nonetheless, still infringe.

2           MR. HOSTENY:  Yeah.  Typically what the patentee tries

3    to do, what a patent applicant tries to do, is they try to get

4    a range of breadth of claims.  And that's one of the reasons

5    why you use dependent claims, and that's one of the reasons why

6    you use method and apparatus, and that's one of the reasons why

7    we have some claims that refer to "persistent" but not "key

8    frames" and some claims that refer to "key frames" but not

9    "persistent."

10          The idea is to get a range of claims so that you have

11   something that's relatively broad, something that's relatively

12   narrow, and hopefully where the patentee comes out is that at

13   least one of those claims is infringed --

14          THE COURT:  Okay.

15          MR. HOSTENY:  -- by whatever the device or method is

16   that's accused of infringing.

17          THE COURT:  All right.

18          MR. HOSTENY:  And sometimes in the file history,

19   you've got to give something up because an examiner -- and we

20   have that issue here where we differ.  That's over this Gupta

21   patent, which we'll get to.

22          THE COURT:  Okay.

23          MR. PAVANE:  I was simply going to say that I think

24   your Honor made the point already that the statement there

25   about our attempt to narrow the claims or broaden them, as the

1    case may be, for invalidity or infringement is really two sides

2    of the same coin.  Of course, the plaintiff is looking at it

3    from the other side and doing the same thing.

4            THE COURT:  Right, yeah.  No, I just wanted to know

5    the motivations, and I think I understand them on each side.

6            MR. HOSTENY:  Yeah.

7            THE COURT:  And I have no idea -- and maybe you'll

8    tell me or not -- what effect any of these claim construction

9    rulings will have on issues of infringement or anticipation or

10   obviousness.  And maybe that's what the briefs will look like

11   after I make claim construction rulings.

12           MR. PAVANE:  I will say that -- and I think

13   Mr. Hosteny will probably agree with this.  I don't think every

14   single claim term here in dispute is a case-dispositive claim

15   term.  Some are dispositive maybe of some claims but not

16   others; some may not be dispositive at all, but simply to bring

17   clarity because ultimately the goal here, or the ultimate

18   purpose here is that if this ever did go to trial -- and this

19   is slated as a jury trial -- the jury has to understand what

20   these claims mean.

21           And so part of the exercise is to bring clarity to the

22   terms so the jury can make an appropriate determination.

23           THE COURT:  Right.  It's -- well, it is the nature of

24   the beast, I guess, that you need a judge to tell you what

25   plain English means, and then a jury decides once that plain

1    English has been there.  A jury then has to decide whether or

2    not the product infringes or not or whether or not prior art

3    invalidates it or not.

4           MR. HOSTENY:  I mean, one of the problems with early

5    claim constructions is that -- and, actually, the case that

6    started all of this, *Markman*, said you could do it at the

7    summary judgment stage because at the summary judgment stage,

8    you know what really counts.  You know what the real argument

9    is; you know what the real prior art is; you know what the real

10   non-infringement position and then infringement positions are.

11          And you decide, "Well, do I have to construe this or

12   not?"  And the answer is "Yes, I do," or "No, I don't."

13          THE COURT:  Right.

14          MR. HOSTENY:  When you do it early on, it's the

15   parties picking the terms that they estimate may have some

16   effect on the future conduct of the case.

17          But some of these will probably fall by the wayside.

18   I think there's a couple in here that probably will.

19          THE COURT:  Well, if there's any that you both agree

20   should fall by the wayside at any point today --

21          MR. HOSTENY:  Please let me know.

22          THE COURT:  -- please let me know and say we don't

23   need to deal with it.

24          MR. HOSTENY:  Yeah.

25          THE COURT:  Okay.  Go ahead, Mr. Hosteny.

1      MR. PAVANE:  If I could just add one thing.

2      THE COURT:  Yeah.

3      MR. PAVANE:  Conversely, I believe in this case we

4   were confined to ten claim terms.  Am I right about that?

5      MR. GASEY:  That is correct, your Honor.

6      MR. PAVANE:  Yeah.  So it's conceivable that down the

7   road as we -- if we do get near trial at some point that the

8   parties may actually come to you and say, you know, there's a

9   couple of other terms we need to get some guidance on.

10      THE COURT:  All right.

11      MR. PAVANE:  Yeah.

12      THE COURT:  Fair enough.

13      MR. HOSTENY:  Yes.  That's what's I call the

14   vicissitude of claim construction.  It may never end.  I was at

15   the Federal Circuit on Friday, and we were arguing claim

16   construction of "between," believe it or not, the word

17   "between."

18      Here's the first point, and then I'll turn it over to

19   our colleagues on the defense side.

20      But the parties differ on what a "file" is.  And we go

21   to the specification, and we see -- and we see that an "audio

22   file" and a "video file" is what we call them.  But they say,

23   "However, also a live encoded feed output is possible."

24      And that live encoded feed output is the FV1, FV2, FVN

25   that's shown in the diagram that I showed earlier.  Those are

1    the -- what's being provided to the feed distributor.

2            So you can have what are called files, or you can have

3    live encoded outputs.

4            And then they say we also use -- "the generic term

5    'audio signal' and 'video signal' will be used."

6            The defendant's position is a file is a collection of

7    data that has a unique name.  I'd agree that it is information.

8    It can be an ongoing blur of information, such as in a live

9    feed, or it can be more of a static collection of information.

10           In any event, the patent doesn't require that a file

11   have a unique name.  A file can have a name.  The patent does

12   not require it to have one, and the claims do not require it to

13   have one.  So it's an element which may be present but is not

14   required by the claims.

15           Our next slide here is if you look at the claims, you

16   will not see "unique name" in any of the claims.  It's not

17   there.  That's the first signal that we have that it's not an

18   important thing.  It's not something of significance to the

19   invention.

20           The specification doesn't mention a file having a

21   unique name.  On the contrary, the specification says a file is

22   an audio or video signal.  It can be a live encoded feed.  It

23   can be digitized information.

24           We -- both sides cited cases, which essentially some

25   say it's a collection of information with a name; some say it's

1    simply a collection of information.  So you have cases going

2    both ways.

3              It can be a live encoded source.

4              I think this is really an extraneous limitation to

5    plug this into the meaning of "file" when you look at the

6    claims and you look at the specification itself.  And I don't

7    think it should be there.  And I think you have the clue that

8    it shouldn't be there when you see things like "unique" and

9    "name" that don't pop up in the claims or the specification.

10             There are -- the other point I'd like to make about

11   this is that you can have files -- here we go.  You can have

12   files that have the same name.  If I have two different

13   computers, both of them can have a file name Text1.  If I have

14   a single computer with two directories, both of them can have a

15   file Text1.

16             BTN says a file has to be distinct.  In each of those

17   examples I'm giving you, the file is distinct.  Each file is

18   distinct from the other, even though they have the same name.

19             I don't think it adds anything to the meaning of the

20   invention.  I don't think it adds anything to the understanding

21   of the invention to say that a file has to have a unique name.

22             It is, however, a new limitation.  And that's where we

23   should not go.  There's no support in the claim; there's no

24   support in the specification.

25             Really, the support in the specification is in the

1    other direction, broader, without the requirement of a name.

2         I think we're at the point where I turn it over to

3    Mr. Schlatner or Mr. Pavane.

4         THE COURT:  Okay.

5         MR. PAVANE:  Thank you, your Honor.

6         Hang on.  It should be up in just a second.

7         Here you go.

8         MR. HOSTENY:  Thank you.

9         MR. PAVANE:  May I approach and hand up our --

10        THE COURT:  Sure.

11   (Document tendered to the Court.)

12        MR. PAVANE:  So, your Honor, before I begin, I do want

13   to make one point about some statements Mr. Hosteny made during

14   his preliminary comments.

15        And you may recall some of this from the tutorial, but

16   by way of refreshing your recollection on this, the --

17   Mr. Hosteny showed you during the opening slides two different

18   implementations of a streaming system.  One was where you have

19   these different camera angles where he showed the baseball

20   players, and they're standing around and so on and so forth,

21   and then they're running.  And so it's different camera angles.

22        The second implementation he referred to was something

23   that he didn't use these words, but what it's known in the art

24   is adaptive bit rate streaming.  And that's where you have a

25   situation where you have, as Mr. Hosteny correctly pointed out,

 1    different bandwidth connections from the Internet, or the

 2    cloud, to various types of devices, such as mobile phones,

 3    desktop computers, laptops, et cetera.

 4           And bandwidth, I just want to amplify that just a

 5    little bit to give you what I think is an apt analogy.  So if

 6    you looked at all these devices -- if I had sitting on my table

 7    here a laptop and a cell phone and a desktop computer, and

 8    envision that each of those is at somebody's house.  It's a

 9    destination.  And you want to drive to that destination.

10           And view that this fellow sits on an interstate

11    highway with eight lanes with a desktop computer.  My laptop is

12    on a county road that's got four lanes, two in each direction.

13    And my mobile phone is sitting on a side street in a rural,

14    suburban area.

15           So if you tried to funnel the same number of cars to

16    each of those destinations at the same time, we can all agree

17    that it's going to take a lot longer to get to that suburban

18    location because eventually it's going to move into a single

19    lane.

20           So bandwidth, the best way to think about it is it's

21    really a capability.  It's how much can it handle.  How much

22    can this particular connection handle, not how much is going

23    down at any given time.  That's the bit rates per second of the

24    actual transmission, and that can be low and it can be high

25    depending on what you're transmitting.  Sometimes you're

1    transmitting nothing.

2         But the available bandwidth, the number of lanes, is

3    always there to be used.  And that's what bandwidth is: it's

4    capability.

5         So when you're dealing with a cell phone, as

6    Mr. Hosteny pointed out, for technical reasons that we don't

7    really need to understand, the bottom line is they have very

8    low bandwidth.  They're going through the air.  They're not a

9    hard-wired connection like a desktop typically is, and

10   therefore you're going to have a single lane going to that.

11        So if you want to send a video signal over there, you

12   can simply not send a high-resolution video signal.  It's

13   impossible because it can't handle the number of bit rates per

14   second to give you that sharp view you see on your

15   high-definition TV at home, on your smart screen at home.  It

16   can only see something far less than that.

17        And that -- so what they do to accommodate that is

18   they -- recognizing that problem, people who create videos for

19   streaming create them in what we call multiple bit rates.  So

20   they might have one that's destined for desktops that goes at a

21   million bits per second.  They might have one for iPads and

22   so on or laptops that go to 200,000 bits per second.  And then

23   a cell phone might go at far less bits per second.

24        And as you can appreciate, the less bits you get, the

25   less clarity the image is going to have because the more bits

1   you have, the more information.  And, therefore, you can fill

2   in all the little gaps of what the image looks like.

3         What I'm leading up to here ultimately is the fact

4   that if you read this patent, there is not word one -- word

5   one -- about this concept of adaptive bit rate stream.  There's

6   no discussion at all about how you would create these multiple

7   bit rates.  There's no discussion at all of streaming streams

8   with different resolution.  It's just not present.  It's not

9   what this invention was.

10        And the only thing that's discussed in here is

11  these -- is the concept of different camera angles, switching

12  among different cameras so that you can get different views.

13  So I just wanted to make that point.

14        THE COURT:  Well, I saw the -- I recall the

15  demonstration during the tutorial with the opera -- the

16  different views of the opera.  And then I think we got on

17  someone's smartphone to look at the Big Ten -- Big Ten 2GO I

18  think is the --

19        MR. PAVANE:  Yes.

20        THE COURT:  You don't have, I take it, the -- and I

21  think I asked this question at the tutorial.  But I can't sign

22  up for Big Ten Network and watch a Big Ten basketball game and

23  somehow from home control the cameras, the different camera

24  angles that are present.  Say you have five cameras covering

25  the game, you know, one at each end, couple covering the

1   benches and one overhead or something.

2           I can't from my home control which camera, as you

3   could in the opera example, where you could control whether

4   you're looking at it from the front, the side, or the back.  I

5   can't do that in the Big -- in your product, correct?

6           MR. PAVANE:  That's correct; you cannot do that.

7           THE COURT:  But there is a mechanism where I can --

8   this adaptive bit rate streaming where I can somehow control

9   or -- have some control over the resolution?

10          MR. PAVANE:  Yes, there is a way that you can select

11  the resolution of the stream.  Typically it's done

12  automatically.

13          THE COURT:  Yeah, because I would think it would be.

14  And that's based on the type of device you're on, correct?

15          MR. PAVANE:  That's correct.  But there's an override.

16          MR. SCHLATNER:  Best available.

17          MR. PAVANE:  Right, to the best available.  There is a

18  way you can do that, but you're right.  It's typically done

19  automatically.

20          THE COURT:  All right.  And that's -- but that's the

21  infringing product in this case is their -- what they've got on

22  the -- their method of doing this switching.  Is that correct?

23          MR. HOSTENY:  Right.  That's correct.

24          THE COURT:  Okay.

25          MR. HOSTENY:  Yeah.

1        THE COURT:  Just so I know what we're -- what the

2  target is on all this.

3        MR. HOSTENY:  *Phillips* is the answer, the *Phillips*

4  case.

5        THE COURT:  Why do you say that?

6        MR. HOSTENY:  Because *Phillips* says the general rule

7  is that the specification need only describe one embodiment.

8        THE COURT:  Okay.

9        MR. HOSTENY:  But the claims can be broader.  And

10  *Phillips* says --

11        THE COURT:  Oh, fine.  Yeah, I understand that.  I

12  just wanted to make sure I knew what the product was that you

13  allege is infringing.  And fair enough.  Okay.

14         And your point is that there's nothing about

15  adaptive bit rate streaming in the patent.  It instead deals

16  more with the differing camera angles or switching between

17  camera angles.

18        MR. PAVANE:  And it's different technology that is

19  necessary to achieve this adaptive bit rate streaming versus

20  the camera angles.

21        THE COURT:  All right.  Well, I guess that will be

22  our -- that's the dispute.

23        MR. PAVANE:  Agreed, your Honor.

24        I just want to point out one other thing to you.  And

25  this is not going to come up here today, but it may come up

1    down the road.  And there was a Federal Circuit case that was

2    decided *en banc* back in 2010 called *Ariad Pharmaceuticals*.

3    *Ariad*, A-R-I-A-D, *Pharmaceuticals*.  It's at 598 F.3d 1336.

4          And what that case said was that if you're going to

5    put a particular spin or interpretation on a patent claim, you

6    have to have written description support for that claim.  And

7    what that means -- that's embodied in Section 112 of the patent

8    statute.  Every patent that's issued has to have a written

9    description of the invention in such full, clear, concise, and

10   exact terms, so on, so on, so on.

11         And what the case says is that it has to be such that

12   somebody reading the patent walks away with a definite and firm

13   conviction that what you're claiming was your invention now in

14   court was really what you invented back then.

15         And we will submit, if the construction goes the other

16   way here, that clearly there's no written description for this

17   whatsoever in this patent.  You can search from the first page

18   to the last, and you will not find it.

19         So let me move on now to our presentation.

20         Okay.  So we're all familiar with the patent-in-suit.

21   Yeah, I too wanted to just make one quick point about this

22   Figure 2, which is on page 3 of our presentation.  And I

23   believe Mr. Hosteny alluded to this or even discussed this, but

24   just to -- I want to highlight this point, that the streaming

25   of the signal, the actual video signal that's getting streamed

1   from the server side on the right to the client side on the

2   left goes across that --

3           THE COURT:  Yeah, just give me the numbers.  So 11 to

4   17?

5           MR. PAVANE:  Yes, sir.

6           THE COURT:  So I have --

7           MR. PAVANE:  11 to 17.

8           THE COURT:  Okay.

9           MR. PAVANE:  Goes over that connection 18.  And you

10  can see that connection 18, like many -- unlike many other

11  connections in that Figure 2, is a one-way arrow going from the

12  streaming server to the client -- that's the video signal --

13  because, obviously, the client is never sending a video signal

14  back to the server.  It's a one-way connection.

15          The one above that, the connection 16 that's between

16  those proxies or stubs, 21 and 30, is where the communication

17  goes both ways between the client on the left and the server --

18  and the server side on the right.  And as Mr. Hosteny -- I

19  agree with him on this -- correctly points out, that that is --

20  according to the patent -- is the way the client knows which

21  different camera angles are available for viewing.

22          And the feed -- the server side sends that down over

23  that connection 16.  And then the client can go back over the

24  connection 16 and say, "Okay.  Send me this one."

25          So that's --

 1          THE COURT:  All right.  And, Mr. Hosteny, are you

 2    contending then that 16 is also then the -- on the same

 3    analogy, this is where the client sends the -- on the client

 4    side, he sends the signal to the server side saying they want

 5    the higher resolution?

 6          MR. HOSTENY:  That would be a route for the request,

 7    yes.  I don't think it's really -- I don't think that really

 8    surfaces much in the claims, however.

 9          THE COURT:  Okay.

10          MR. HOSTENY:  There might be language about that in

11    one of the claims.  I'd have to go back and look.  By and

12    large, the claims focus on what's going on on the right-hand

13    side of the picture in terms of the feed distributor and the

14    streaming server.  There is discussion in the specification of

15    the communication from the left side to the right side.

16          THE COURT:  All right.  I'm just trying to overlay

17    the --

18          MR. HOSTENY:  Right.

19          THE COURT:  -- the infringing product on this diagram,

20    if there's a way to do that.  And, you know, I'm sure the

21    defendants don't think there is; plaintiffs do think there is.

22    And I'm just trying to get some perspective on this in

23    practical terms on the product.

24          Okay.  Go ahead.

25          MR. PAVANE:  The only -- I think the only claim term

1    that's implicated that we just discussed in terms of where the

2    communications take place, there is a claim term at the end

3    that we'll get to.  I believe it's something like "without

4    using the bandwidth of the streaming signal" -- "of the

5    streaming" -- we'll talk about that at the end, though.

6         Okay.  So the first claim term Mr. Hosteny discussed

7    is the question of "file" or "first audio file."

8         And I believe he correctly stated that the main

9    dispute amongst us -- between us is that we believe that a file

10    can't be simply a collection of data because anything is a

11    collection of data.  The point here is that there has to be

12    some way -- and as Mr. Hosteny just discussed in his -- we just

13    discussed with reference to Figure 2, there has to be a way to

14    identify which file it is that you are seeking to stream down.

15         Even in the Figure 2 embodiment, there's a "first

16    audio file" in all of those various video files.  If a file

17    doesn't have a name, if it doesn't have some way of identifying

18    itself, there's simply no way that the client side can possibly

19    stream down the correct file.  It simply can't happen.

20         So, again, I'm not -- I don't think we're asking

21    something here that's necessarily case-dispositive, but this

22    is, in fact, simply what a file means.  It's got to have some

23    separate means of identification.

24         And I don't believe that anything in the citation that

25    Mr. Hosteny provided at Column 4 of the patent he presented on

1   Slide 14 in his slide set indicates otherwise.  It doesn't go

2   to the question of what a file means.  There's no discussion

3   anywhere in the patent that a file means this or a file means

4   that.

5          We don't dispute that a file can include, for example,

6   a live source.  Clearly one of the things they're talking about

7   here is a live source.

8          But the live source has to have a file name so that

9   the client can identify it.  And I don't see how you can take a

10  broad definition and simply say it's a collection of -- I'm

11  sorry -- it's an output of an audio source representing

12  digitized information.  That's true of anything.

13         So we think it has to have -- and I think the

14  definitions clearly support that.  If you look at all the

15  technical definitions, they all talk about a file having a name

16  so it's separately identifiable.  Each file must be

17  distinguishable from another file in some fashion.

18         And I think your Honor even may know this from just,

19  you know, working with computers in general: that whenever you

20  store something to a system, you've got to give it a name.  If

21  you don't give it a name, you won't find it again.  If you

22  click close before you give it a file name, that file is lost

23  because the computer's got no way to identify it as a separate

24  collection of data.

25         So we think it's a relatively simple concept and a

1     very simple definition.  It's the one that is commonly used in

2     the industry.  It's supported by those technical dictionaries.

3              THE COURT:  There's no definition of "audio file" or

4     "video file" in the specs, is there?

5              MR. PAVANE:  That's exactly right.  There's no

6     definition anywhere.

7              MR. HOSTENY:  Well, I mean, there is to the extent

8     when it says that they can be live sources.  They use the

9     terminology "file," but they also mean audio and video signals.

10    If it's a definition, it's a very, very loose one.

11             I don't agree with Mr. Pavane that all the cases say

12    files have to have names.  Both sides cited cases, some of

13    which say yes, some of which say no.

14             THE COURT:  Well, as a practical matter -- and this is

15    the wrong imprint, obviously, or it may be the wrong imprint.

16    But, you know, of course files, whether it's a hard-copy file

17    or a file on your computer, you name it so you can find it.

18             But this seems to be something different.  I mean, as

19    a matter of logic, certainly you name files.  Otherwise, it's a

20    collection of data and something that has no name, and you'll

21    never find it again.

22             MR. HOSTENY:  Except if the file is Text1 and it's on

23    Server A, and the same file with the same name, Text1, is on

24    Server B.  They have the same name; they are not unique.  But

25    they are differentiated by their locations, not by their names.

1        THE COURT:  Well --

2        MR. HOSTENY:  Or on the same computer in different

3   directories.  On our network, we have directories for

4   attorneys.  There's a JNH directory; there's an AAG directory.

5   We can each have as many files as we want that have exactly the

6   same names but differentiated by their location, not by their

7   names, and certainly not unique names.  Unique is -- is -- it

8   doesn't make a whole lot of sense.

9        MR. PAVANE:  Again, if I could just briefly respond to

10  that.  I don't agree with that, the second part of that.  I

11  mean, I agree people and different computers maybe have the

12  same file name somewhere, but that's not what we're talking

13  about here.

14        Don't forget, we're talking about the first audio file

15  and the first video file that are at the server side that are

16  being streamed to the client.  Those have to have unique names.

17  Otherwise, there's no way for the thousands of clients who are

18  accessing them to get them.

19        And, secondly, with respect to this point about that

20  it could be on a C:\ drive or a D:\ drive and have the same

21  file name, that's to me confusing two different concepts.  If

22  you put a file with a name -- a file in a C:\ drive and you put

23  the same file in the D:\ drive, the file path to those files

24  have a unique name.  You've seen it:  "C:\" for the C:\ drive

25  and then the file path to that particular file name.  If you

1    put it also in your D:\ drive, when you call it up, you'll see

2    it'll say "D:" and then "\."

3         So each one on that computer certainly has a unique

4    file name.  It's the entire file path to separately identify

5    it.  And, again, when you go to call it up, you don't call it

6    from whatever -- whether it's in C:\ or D:\; you call it up by

7    the full path, and you will either get the one you put in C:\

8    if you use that "C:" or you'll get the one you put in D:\ if

9    you use "D:"  But it's got a unique name.

10        THE COURT:  Okay.  I think you both need to slow down

11   a little bit, both for my court reporter --

12        MR. PAVANE:  Sorry.

13        THE COURT:  -- and for me.

14        MR. PAVANE:  Okay.  Sorry.

15        THE COURT:  But so --

16        COURT REPORTER:  And can you pull that mike a little

17   bit closer to where you're standing, please?

18        MR. PAVANE:  Certainly can.

19        THE COURT:  That or you can sit down.  It's fine.

20   This is informal.  It's on the record, but it's informal.  If

21   it's easier to sit down and be near the mike, I can hear you

22   perfectly fine.

23        MR. PAVANE:  Okay.

24        THE COURT:  Okay.  Very good.  I don't know that I

25   need reply arguments unless you all think we ought to do it,

 1    but I think -- I've got briefs on this too.  So --

 2              MR. HOSTENY:  Yes, you do, your Honor.

 3              The only point I'd like to make is that a path of a

 4    file and the name of a file are two distinct things.  They're

 5    not -- they're not all considered one and the same.  A path is

 6    different from a name.  A path is where I can find it; a name

 7    is a name for it.  I don't see any justification for a unique

 8    name here.

 9              Can have one, but the claims don't require it.

10              MR. PAVANE:  And the only point I would add is if they

11    don't have some means of identification, how does the system

12    work?  How does Figure 2 function?

13              THE COURT:  Okay.  All right.  Anything else on this

14    first claim construction?

15              MR. HOSTENY:  Not --

16              THE COURT:  Of course, I'm not ruling today, so --

17              MR. HOSTENY:  Not from Cascades, your Honor.

18              THE COURT:  Okay.  And I -- again, I've read your

19    briefs.  I'll reread them after today, and I'm sure I'll reread

20    them yet again after that.

21              Let's go off the record for a minute.

22         (Off-the-record discussion.)

23              THE COURT:  Okay.  All right.  We'll go back on the

24    record.

25              Go ahead.

1      MR. HOSTENY:  The second issue -- and this is going to
2   make a difference in the case, I think -- is the disagreement
3   between the parties about the issue of what I'll call point of
4   view.
5      And I think we've got to keep in mind that one of the
6   obligations of an examiner is to ensure compliance with not
7   only Section 101 and Section 102 and Section 103 and
8   Section 112 -- but also Section 112.
9      He's got to be sure that the claim is understandable
10   in light of the specification, that it provides the information
11   that's needed.  And he's supposed to reject the claim if it's
12   not definite, if it's vague, and so forth.
13      So that's why we have the presumption of validity.
14   The Federal Circuit's decisions now, examiners do misfire.
15   Sometimes they do.
16      But the Federal Circuit says that, generally speaking,
17   the examiner is presumed to have some knowledge of what the
18   level of skill in the art is.  He's treated as a quasi-judicial
19   official.  And generally the work of the examiner is to be
20   respected unless somebody can show that he made a mistake.
21      So that's why we have the presumption of validity.
22      Now, what we have here is that claims 17, 18, and 22
23   just require the second file to be "different from."  The
24   defendants want it to be a "different point of view."  The
25   first question that comes up was if the plaintiffs wanted to --

1   if the patentees wanted to restrict their invention to a "point

2   of view," one would reasonably expect that more of their

3   claims, if not all of their claims, would refer to a "different

4   point of view" rather than just "different."  That's not the

5   case.

6          Most of the claims do not refer to a "point of view."

7   There is one claim, claim 14, that's dependent on claim 12.

8   Neither of those claims is asserted here.

9          Claim 14 adds a "point of view."  So you've got

10  claim 12 with A, B, C, and D, and you have claim 14 adding

11  element E, which is a "point of view."  But none of the other

12  claims do.

13         The general rule is if a limitation is added in a

14  dependent claim, then the claim on which it depends does not

15  include that limitation.

16         Claim 12 is worded similarly in this respect to all

17  the other claims.  So we're saying you cannot insert the

18  limitation of "point of view" into all the claims for that

19  reason alone.

20         THE COURT:  Say that again.

21         MR. HOSTENY:  If a dependent claim, like 14, says

22  "point of view," then normal -- the normal construction of

23  claim 12 -- there are exceptions, but the normal construction

24  of claim 12 is that it is broader than the dependent claim,

25  claim 14.  Therefore, claim 12 does not require a "different

1    point of view."

2            What we're saying here is the defendants regarded

3    this -- the patentees regarded this as part of their concept

4    but that their claims were not limited to that.  Okay?

5            THE COURT:  At least the independent claim 12 wasn't.

6            MR. HOSTENY:  Correct.  Independent claim 12.  And the

7    other claims that are asserted are comparable in that respect.

8    So we're saying that they are not limited to "point of view"

9    either.

10           It would have been logical if that was the nature of

11   the invention for that phrase to pop up in more claims than it

12   does.  And, in fact, it only pops up in one dependent claim.

13           THE COURT:  And that's 14?

14           MR. HOSTENY:  14, correct.

15           THE COURT:  And you're not asserting that --

16           MR. HOSTENY:  Not here, no.

17           THE COURT:  -- as an infringing --

18           MR. HOSTENY:  No.

19           THE COURT:  -- as a claim that's been infringed.

20           MR. HOSTENY:  Correct.

21           And the general principle is that the specification

22   has to include at least one embodiment, one description of how

23   to make and use the invention.  And the examiner is supposed to

24   look at that specification and see if it's adequate to that

25   purpose.

1      The patentee can include different -- more embodiments
2 but doesn't have to include more embodiments.
3      And *Phillips*, the *en banc* decision that I referred to
4 earlier, says that claims are not limited to the preferred
5 embodiment of the specification even if that is the only
6 embodiment described in the specification.
7      And while we'll agree that points of view are
8 described in the specification -- there's no doubt about
9 that -- what the specification says is broader because it
10 refers to audio and video signals, not to signals containing
11 different points of view.  Different signals with different
12 data in them.  The specification is broader in that respect.
13      So we're saying based on *Phillips* as well, you should
14 not limit claims that don't say "different point of view" to a
15 "different point of view."  That would be inserting a
16 limitation into the claims which is inconsistent with what
17 *Phillips* says.
18      Back to the field of the invention briefly.  The
19 inventors say viewing and smooth remote switching from one
20 signal to another signal, whether it's video or audio.
21      There are some -- there are some cases where a claim
22 can be limited based on what the specification says, but they
23 are the exception rather than the rule.  And what we say here
24 is that this case falls within the normal range of what
25 *Phillips* describes because the claims are worded differently;

1    we don't have different points of view.

2          We have a preferred embodiment that refers to audio

3    and video signals without restricting them to different points

4    of view, and we have a number of claims that say "different,"

5    merely "different," not "different point of view."

6          So what we're saying is the claims are infringed here

7    by their adaptive bit rate streaming.  Those are different

8    signals.

9          THE COURT:  The field of the invention is treated as

10   just part of the spec?

11         MR. HOSTENY:  Yes, correct.

12         THE COURT:  It has no special hierarchy within the

13   spec, correct?

14         MR. HOSTENY:  No, it's just part of the specification.

15         THE COURT:  Right.  Okay.

16         MR. HOSTENY:  Same weight or lack of weight as the

17   rest of the specification, as the case may be.

18         And then, you know, it also talks here, "According to

19   a third aspect, the present invention provides a

20   computer-operated method for" --

21         THE COURT:  Slow down.

22         MR. HOSTENY:  I'm sorry.

23         (Continuing) -- "for viewing and switching of

24   audio-video data."

25         Then it refers to audio and video sources containing

1   information referring to an event; streaming contents of a

2   first signal and a -- audio -- and a first video signal from

3   the sources; switching between those signals.  There's no

4   discussion of "point of view" and no restriction of "point of

5   view" in that.

6           And part of the information relating to the event is

7   the bit rate.  From the tutorial slide, the adaptive bit rate

8   gives us a better picture, a sharper, clearer picture of the

9   event.  That's information about the event.

10          Now I can read a number or see a line, a foul line, or

11  see the edge of a net or see whether a tennis ball is in or out

12  of the court.

13          THE COURT:  Well, is a sharper picture a "different

14  point of view"?

15          MR. HOSTENY:  I think -- I think you could

16  characterize it as it's certainly a different view.  I don't

17  know if I'd call it a "different point of view," but I'd

18  certainly call it a different view.

19          THE COURT:  Because when you said this may be

20  case-dispositive, the interpretation of this --

21          MR. HOSTENY:  Yeah.

22          THE COURT:  -- is that because a -- if I read into

23  this claim or -- if that's the right way to put it -- if I read

24  into the claim that a different point of view is required --

25          MR. HOSTENY:  Yeah.

1  THE COURT:  -- there's an argument that their product

2  doesn't -- as -- their current product, at least, doesn't

3  implicate a "different point of view," as opposed to a

4  "different view," which is a more --

5  MR. HOSTENY:  Right, yeah.

6  THE COURT:  -- more concise view.  I'm just trying to

7  put this in terms of -- and maybe I shouldn't, but there's no

8  reason I shouldn't --

9  MR. HOSTENY:  That's fair.

10  THE COURT:  -- understand how this fits into the case.

11  MR. HOSTENY:  Right.  If you were to say that the

12  claims -- that all the asserted claims require a "different

13  point of view" -- well, all of the claims that say

14  "different" --

15  THE COURT:  Right.

16  MR. HOSTENY:  -- require "different point of view" and

17  that "point of view" means, well, I'm looking at first base,

18  and then I change, and now I'm looking at the third base coach

19  and that's what "point of view" means, then those claims would

20  not be infringed.

21  It would be a different story about claims -- I don't

22  think 26 and 28 -- do they say "different"?  I'm not sure they

23  do.

24  So we -- you know, we might be in a situation where

25  some claims would be infringed and others would not.

1          THE COURT:  Okay.

2          MR. HOSTENY:  Okay?

3          THE COURT:  But I just wanted to know why the fight.

4          MR. HOSTENY:  Yes.

5          THE COURT:  Why there's two differing views on this,

6     and I think I understand.

7          MR. HOSTENY:  Yeah.  I mean, yeah, it's clear.  I

8     mean, they would love to have "point of view" because that

9     would get them off the hook, at least, with respect to some of

10    the claims if they're correct.

11         THE COURT:  Right.  Okay.  Fair enough.

12         Okay.  From Big Ten.

13         MR. PAVANE:  Okay.  Thank you.

14         If your Honor is following along in our slide

15    presentation, I was up to, I believe, the slide on page 11.  So

16    let me just scan ahead here.

17         Okay.  So the claim term here is -- and it appears in

18    claims 17, 18, and 22, which is "the second file being

19    different from the first video file."

20         And Cascades' construction would say that "The second

21    file has a different content, for example, a different camera

22    angle or additional image detail, from another video file."

23         So they're encompassing, by "additional image detail,"

24    the adaptive bit rate streaming we talked about before, whereas

25    BTN's construction would say that the second of the two files

1    has a different point of view from the first video file.  So

2    that's a pretty clear dispute between the parties.

3         And your Honor is correct, by the way, that cases do

4    say that you have the right to understand and you should --

5    understand the infringement issues as you're evaluating the

6    claim construction.

7         THE COURT:  All right.

8         MR. PAVANE:  There's not no -- nothing -- you're not

9    supposed to do it in the blind, so to speak.

10        THE COURT:  Good.

11        MR. PAVANE:  Yeah.

12        So my next slide on page 12 now shows where the term

13   appears in the claim, and we've highlighted that.

14        I now want to talk to you, your Honor, about the

15   section of the patent that's called the "Summary of the

16   Invention."  And you will see that in our opening brief on

17   page 7, we cited a number of cases that talk about the

18   significance of the applicant, the applicant or patentee, who

19   presumably knows what he's talking about when he writes his

20   application for patent.

21        When the applicant for patent identifies in the

22   "Summary of the Invention" what he calls "The present

23   invention" and uses those -- those particular words are the

24   words that are described in the case law.

25        And you will see, your Honor -- and if --

1    Adam, do you want to go put this up on the screen,

2  please?  Start with this page.  Just put the page up.  I think

3  the whole page will go up.

4    MR. SCHLATNER:  Mm-hmm.

5    MR. PAVANE:  And by the way, your Honor, the "Summary

6  of the Invention" appears in this patent-in-suit at -- starting

7  at Column 2, line 30, and it continues over to Column 3,

8  line 51.

9    That's kind of hard to read.  Do you have a clean copy

10 of the patent?

11    THE COURT:  I do.  Let me pull it out.

12    MR. PAVANE:  Okay.  So I'm first looking at -- Adam,

13 I'm trying to call up, in Column 2, lines 30 to 38.  If you can

14 focus in.

15    THE COURT:  So you're in Column 2?

16    MR. PAVANE:  Yes, Column 2.

17    THE COURT:  Beginning at line 30.

18    MR. PAVANE:  Right under the "Summary of the

19 Invention" heading.  Yes, your Honor.

20    THE COURT:  All right.

21    MR. PAVANE:  So it says -- it begins by saying, "The

22 present invention solves the prior art problems cited above" --

23 and right above that, there's a discussion of the prior art

24 that had different camera angles but was done differently.

25    It says, "solves the problems cited above, by allowing

1    each user to remote control" -- it should be "control," but it

2    says "controlling" -- "between different cameras, thus creating

3    a customized show with a seamless switching and optimal use of

4    bandwidth."

5              And then it goes on to say in Column 2 at -- I'm

6    sorry -- Column 3 at line 25 on the next page -- Column 3,

7    line 25 --

8              Didn't you take that?

9         (Counsel conferring.)

10             THE COURT:  I've got it here.

11             MR. PAVANE:  Yeah, okay.  Column 3, line 25.  It says:

12   "The present invention overcomes the problems of the prior art

13   in several respects: first, the bandwidth is not wasted as done

14   with prior art systems.  The Internet connection carries, at

15   every time, only one video stream and one audio stream.  As a

16   consequence, a virtually unlimited number of different points

17   of view can be used."

18             Right below that, the next paragraph, at line 33 of

19   Column 3:  "In accordance with the present invention, there is

20   no need to establish a new session over a new connection each

21   time a switching of point of view occurs."

22             And then, finally, right below that:  "The present

23   invention is particularly advantageous in a system requiring a

24   high number of cameras, like for example 30 to 50 cameras."

25             So every place here in the "Summary of the Invention"

1  where they talk about the present invention, they clearly talk
2  about the fact that they're talking about different points of
3  view.

4          And, again, the case law is particularly clear on
5  that.  And, again, I'd urge you to look at the cases we cite at
6  page 7 that indicate when an applicant goes out of its way to
7  identify something as "the present invention," it should be
8  taken at its word, and that is what the present invention is.

9          The second point I wanted to make was that, your
10  Honor, I think you'll recall there was something -- they filed
11  something called a provisional application way back at the
12  beginning, the very first application in this chain of
13  applications that led to the patent.  It's identified on the --
14  if you have the face of the patent, you'll see on the left-hand
15  side there are little parenthetical numbers running across
16  the -- down the page, and there's a number (60) there.  If you
17  scan down there, it's about halfway down the first page.

18          THE COURT:  Right.

19          MR. PAVANE:  It says:  Provisional application
20  No. so-and-so, filed on so-and-so.

21          They're claiming priority for all of these claims back
22  to that date.  Now, why is that significant?  Because,
23  obviously, if they get back to that date for all of their
24  claims, that means that prior art has to be before that date.
25  And that's why you'd want to go back in terms of claiming

1    priority.

2         And if you read that provisional application, again,

3    not a mention of anything except different camera angles.

4    That's what the whole provision is.

5         THE COURT:  If they claim priority on a -- well, was

6    this their application?

7         MR. PAVANE:  Yes, sir.

8         THE COURT:  Okay.  Yeah, it has to be theirs to claim

9    priority, I would assume.

10        MR. PAVANE:  Yes, it would be.  Yes, that's true.

11        THE COURT:  Okay.  But by claiming priority on it,

12   that becomes the date by which the statute of limitations

13   begins to run -- or the -- not the statute of limitations, but

14   the life of the patent?  What is the term of a patent now?

15        MR. PAVANE:  I think it actually runs 20 years, but I

16   think it actually runs from the U.S. filing date.

17        THE COURT:  Okay.

18        MR. PAVANE:  I'm sorry.  That was a mistake.  Not the

19   U.S.  That is a U.S. filing date.

20        THE COURT:  Yeah.

21        MR. PAVANE:  It runs from the -- not the provisional

22   date, but the actual date of the full application.

23        THE COURT:  Oh, so the -- the date of --

24        MR. PAVANE:  I believe that's right.

25        Am I right about that?

1          THE COURT:  The date of patent, the April 10th, 2012,
2     date is --
3          MR. PAVANE:  They're not sure either.
4          THE COURT:  Okay.
5          MR. PAVANE:  I think that's right.  I think I'm right
6     about that, that it runs from the --
7          MR. SCHATZ:  I'm not a hundred percent sure.
8          MR. PAVANE:  Yeah.  I'm not a hundred percent sure,
9     but I think it does run from the U.S., not the provisional
10    date.
11         THE COURT:  Okay.  But the point of a provisional
12    patent is -- or a provisional application, it allows the --
13    your point is that's the date by which any -- well, it's not
14    even prior art -- any publications that occur after that date
15    cannot be considered prior art?
16         MR. PAVANE:  Yeah, with the following understanding:
17    for whatever is disclosed in there.  So what happens many times
18    is -- and let me just back up for a second.  Why do people file
19    provisional applications?
20         THE COURT:  Right.  Go ahead.
21         MR. PAVANE:  Okay.  So here's the answer to that.  It
22    was introduced not that long ago in terms of the life of the
23    patent system, anyways, maybe 20 years ago or something like
24    that.  And they brought in this system for filing provisional
25    applications basically to give people who were not big

1   corporations -- and they use it, but that wasn't what it was

2   intended for.

3        A small inventor who says, "Okay.  I have a good idea,

4   but, you know, I'm not really sure I want to spend $8,000

5   hiring a patent attorney to write up a whole detailed

6   application for me."  That costs real money.

7        So what you can do is you can file this provisional

8   application in any form.  There's no real requirements in terms

9   of the content.  Doesn't have to look like anything.  It

10  doesn't have to have various headings like you see in a patent.

11  And it stays on file for one year, and the filing fee is very

12  low.  It's I think $150 even today, and maybe for a small

13  entity or a small businessman, it's $75.

14       And you get it on file.  It gives you a date for

15  whatever you disclose, and then you have a full year to decide

16  whether, okay.  Do I really want to pursue this or not?

17       If you pursue it within the year, then when you file

18  your real application, if you did it within a year, you'll get

19  the benefit of the earlier provisional filing date for

20  everything that's in there.

21       And, in fact, if you look, you'll see that the filing

22  date of the next application in the chain, which is on line 63,

23  right above the one we looked at, was July 2nd, 2001, which was

24  within one year of the provisional filing date of July 15th,

25  2000.

1          So they did file within a year and, therefore, for

2     whatever is disclosed in the provisional, they get the benefit

3     of the provisional date in all of the applications in the chain

4     that go from there.

5          THE COURT:  Well, the -- all right.  The provisional

6     was filed on July 15, 2000.  The continuation was filed

7     July 2nd, 2001.  And then we have this patent being filed

8     July 2nd, 2009.

9          MR. PAVANE:  Right.  So how that works.  Okay.  Good

10    question.

11         THE COURT:  Yeah.

12         MR. PAVANE:  So what happened was -- and if we looked

13    in the file history, we'd see this, but I know this from just

14    having practiced in this area.  What that means is that the

15    second application, what you called the continuation, was filed

16    correct, as you said, July 2nd, 2001.  It continued to pend all

17    the way through -- in other words, it was still in the patent

18    office; had not yet issued as a patent -- all the way up to

19    July 2nd, 2009.

20         So as long as -- at any time while you have an

21    application pending in the office, you can file a further

22    continuation of that application or we -- sometimes what is --

23    they file what's called a divisional.

24         Basically, it's filing the same exact application.

25    Almost all the time, it's the same application, but you're just

1   doing it to put in a different set of claims, or because you

2   prosecuted the case to a certain point, and your only choice

3   left is to either appeal it to the patent office board of

4   appeals, or, if you want to continue, have another crack at the

5   examiner and not appeal it, you can file a continuation and go

6   back to the examiner, pay another fee -- that's the patent

7   office's penalty:  "Okay.  You want to talk to the examiner

8   again?  We're going to make you pay another filing fee."

9           So you pay another filing fee, and you can go back and

10  argue it some more.

11          THE COURT:  Okay.

12          MR. PAVANE:  So when they filed on July 2nd, 2009,

13  that first case was still pending; and, therefore, the second

14  case filed in July of 2009 also would be entitled to the

15  provisional filing date.

16          THE COURT:  All right.

17          MR. PAVANE:  Because there's a continuity of the

18  chain.

19          THE COURT:  Mr. Hosteny, do you agree with

20  "Patent 101" here?

21          MR. HOSTENY:  Not entirely.

22          THE COURT:  All right.  A disagreement in a way that's

23  important to the case?

24          MR. HOSTENY:  Yeah.

25          THE COURT:  I'm just trying to get some general

1    background.

2            MR. HOSTENY:  I think so.  I think the provisional is

3    a side issue.  It doesn't get examined.  It's a date-holding

4    device that might be of use in the future.  But it depends

5    on -- you know, nobody's -- the examiner doesn't bother with

6    the provisional application; he looks at the application.

7            The life of the patent is measured from the filing

8    date, 20 years.  The filing date will either be 2001 or --

9    I'm -- 2000 or perhaps -- I'm sorry.  It will either be 2001 or

10   perhaps the filing date of the provisional.  That's all the

11   provisional is for.

12           I agree with Mr. Pavane.  It can be sort of a

13   wide-open kind of thing, not a lot of formality to them.  I

14   don't think it means anything here insofar as interpretation of

15   claim terms are concerned.  I don't think the provisional even

16   includes claims, if my memory is correct.

17           THE COURT:  But if it did -- well, the two important

18   points, I guess, is if it did contain any information about

19   claim terms that are being interpreted in the present patent,

20   since the provisional was filed by your inventors, you've got

21   to live with that, right?

22           MR. HOSTENY:  You have to live with what they say.

23           THE COURT:  Right.

24           MR. HOSTENY:  But whether it's going to have any

25   effect -- and I'd be surprised if the inventor said things

1    substantially different in the provisional from the

2    specification, but that can occur because the provisional is

3    often done by an inventor on his own.

4              THE COURT:  Okay.

5              MR. HOSTENY:  And an application is usually done with

6    the assistance of a lawyer.

7              THE COURT:  Okay.

8              MR. HOSTENY:  So there can be differences.

9              THE COURT:  And if there is a disclosure in the

10   provisional, though, that is -- that ends up being important in

11   the later-filed issued patent --

12             MR. HOSTENY:  Mm-hmm.

13             THE COURT:  -- the prior art -- the date by which you

14   look at prior art to possibility invalidate that patent goes

15   back to the provisional, not during the pendency of the

16   provisional?

17             MR. HOSTENY:  Yes, it could be.  It could be.  Keep in

18   mind the inventors may add something --

19             THE COURT:  Right.

20             MR. HOSTENY:  -- when they file the actual

21   application.  Then you can have a dispute over whether that's

22   disclosed in the provisional, and then you might wind up with a

23   different priority date that does not reflect the date of the

24   provisional.  We're not at that point.

25             THE COURT:  Okay.  Fair enough.  All right.  This is

1    helpful just for general understanding --

2         MR. HOSTENY:  Yeah.

3         THE COURT:  -- for me.  I understand it may not apply

4    to where things are at right now.

5         So go ahead, Mr. Pavane.

6         MR. PAVANE:  Thank you.

7         The second point I want to make, I want to address

8    Mr. Hosteny's claim differentiation argument.  His argument was

9    that because claim 14 talks about different points of view and

10   claim 12 doesn't, and claim 14 is dependent on 12, therefore

11   you can't assume that claim 12, for example, encompasses

12   different points of view.

13        Several things on that.  Firstly, I think your Honor

14   knows this.  Neither claims 12 or 14 are asserted in this

15   action.  I think the lowest claim number that's being asserted

16   here is -- is it 16, I believe?

17        MR. HOSTENY:  (Nodding head.)

18        MR. PAVANE:  Yes.

19        Secondly, the claim differentiation rule that

20   Mr. Hosteny posits is not really a rule.  What the case law is

21   very clear about -- and we cite these cases in our brief -- is

22   that if there is a different distinction between the claims

23   you're looking at other than the one that you're focused on,

24   then claim differentiation simply doesn't apply.

25        So in other words, if there are other limitations

1  being added in Mr. Hosteny's example in claim 14 beyond what's

2  in claim 12 other than the different points of view, the

3  claim -- the claim differentiation argument goes out the

4  window.

5  　　　　And that's the case here.  There are other limitations

6  being added in claim 14 beyond simply mentioning different

7  points of view.

8  　　　　And more specifically, the claim 14 says -- also says,

9  "wherein the plurality of audio and video source signals

10  comprise a single audio source signal and a plurality of

11  video."  So they're further defining the audio and video

12  signals in claim 14, not just different points of view.

13  　　　　The second -- the last point I want to make on that is

14  that they're -- the cases are also clear that it's not a rule

15  at all.  Even in the case where it is the sole distinction

16  between two claims, it's not necessarily controlling.  It's a

17  guide.  And it doesn't necessarily dictate the outcome of the

18  dispute in issue.  And the cases are also very clear on that,

19  and we've cited those cases in our brief.

20  　　　　Now, your Honor, I also want to look a little bit at

21  the file history because I think the file history is important

22  here.  I don't think Mr. Hosteny now has any dispute with the

23  fact, despite their responsive claim construction brief, that

24  when the examiner rejected the claims that were at issue in

25  this case, he rejected all of the claims as anticipated.

 1              And let me call up --

 2              THE COURT:  Is that the Gupta?

 3              MR. PAVANE:  Yes, exactly.

 4              THE COURT:  "Anticipated" means every claim -- I'm

 5    just going back to "Patent 101."  Means that every claim was

 6    contained in a prior disclosed invention.

 7              MR. PAVANE:  The way I would put it is that --

 8              THE COURT:  Prior invention.

 9              MR. PAVANE:  -- if you look -- if you take -- let's

10    take one claim, to keep it simple.  If a claim is anticipated,

11    it means that every single element of that claim --

12              THE COURT:  I'm sorry.  I misused the word.

13              MR. PAVANE:  -- is found in a single reference.

14              THE COURT:  Every element of that claim is in a

15    prior --

16              MR. PAVANE:  Correct.

17              THE COURT:  -- published -- prior reference.  I

18    misspoke, and I meant "element."

19              And does that invalidate an entire patent, or does it

20    invalidate the claim that has been anticipated?

21              MR. PAVANE:  The claim.  It's a claim-by-claim

22    analysis.

23              THE COURT:  All right.

24              MR. PAVANE:  Invalidity is always a claim-by-claim

25    analysis.

1        THE COURT:  All right.

2        MR. PAVANE:  So knocking out one claim doesn't really

3  get you anywhere if you're infringing other claims.  You've got

4  to knock out all the claims you infringe.

5        THE COURT:  And "obviousness" is a -- give me the

6  definition.

7        Mr. Hosteny, I'll let you do this one so you're

8  both --

9        MR. HOSTENY:  Well, you take -- yeah, you take the

10  prior art and you take the claim.  You look at the differences

11  from the standpoint of one of skill in the art --

12        THE COURT:  Right.

13        MR. HOSTENY:  -- and say are the -- is the claim

14  obvious; do the differences make the claim obvious.

15        THE COURT:  Okay.  Very good.  Thank you.

16        All right.  So what page are we on, Mr. Pavane?

17        MR. PAVANE:  Yeah.  This -- I want to show you

18  something from the file history.  I don't think it's in the

19  slide set per se.

20        THE COURT:  Is it in one of the appendices that people

21  have given me?

22        MR. PAVANE:  Yeah.  It's in the joint appendix.  You

23  have that; I forgot.

24        THE COURT:  I do.

25        MR. PAVANE:  That's right, your Honor.  So maybe you

1   could follow along with that.  It's JA129 through JA131.

2            THE COURT:  Hang on one second.

3            All right.  I'm there.

4            MR. PAVANE:  Thank you.

5            So if you look at the very top of 129, you'll see

6   there that the examiner rejects claims 1, 4 -- and I won't read

7   the whole list, but basically that's every claim that was then

8   pending in the case.  And these are the claims that ultimately

9   issued as the patent.

10           And they -- when they issue, what they do is they

11  renumber them because a lot of times during the course of

12  prosecution you'll cancel claims, so there will be gaps in the

13  numbering.  So when the patent actually issues, they'll take

14  them and push all the higher numbers down, fill in the gaps.

15  That's why the numbers don't seem to match up.  It goes up to

16  78, but in the patent it's far less than that.

17           In any event, so he says claims 1, 4, so on are

18  rejected under 35 U.S.C. 102 as anticipated by Gupta --

19           THE COURT:  Whenever you read, you're going to have to

20  slow down because there's always a tendency when you read

21  something verbatim, everyone goes faster.  So slow down.

22           MR. PAVANE:  Okay.  So those claims "stand rejected

23  under 35 U.S.C. § 102(e) as being anticipated by Gupta, *et al*."

24           Okay.  And then the examiner has -- and this is the

25  examiner's office action.  This is where the examiner is

1    writing to the applicant for patent and saying, "I've looked at

2    your application, and I'm rejecting all your claims because

3    every element of all these claims is taught by this Gupta

4    reference."

5            And he goes on to say -- I'm sorry.  I misspoke.  I

6    apologize.  This is actually the applicant's response.  The

7    applicant quoted what the examiner was -- the examiner's

8    rejection.  They repeated the examiner's rejection in their

9    response.  So this is where they're writing back to the patent

10   office and saying, "Okay.  You rejected all our claims as

11   anticipated by Gupta."

12           And then they go on to say in the next sentence at the

13   end of that first paragraph at the top of JA129, "Applicant

14   traverses the rejection."

15           Then they go on to quote exactly --

16           THE COURT:  What does "Applicant traverses this

17   rejection" mean?

18           MR. PAVANE:  It means -- "traverses" means disagrees.

19           THE COURT:  Okay.  Why don't they say it?

20           MR. PAVANE:  Good question.

21           THE COURT:  All right.  Go ahead.

22           MR. PAVANE:  Anyway, so they then go on and they quote

23   in the indented paragraphs that follow exactly what the

24   examiner has cited from the Gupta reference.

25           And then they go on and they add -- at the bottom of

1    page JA129, they say, "In fact, Gupta states," and then they

2    have a quote from the Gupta reference.  And that goes on

3    through page 130.  That whole page 130 is all quotes from the

4    Gupta reference.

5            The key part that I want to direct you to is the last

6    part of the quote of Gupta that is at the top of page 131.  And

7    about, oh, five lines down into page JA131 -- again, this is

8    right out of Gupta -- Gupta says, "However, the video streams

9    have different time lines and also vary by quality and

10   corresponding bandwidth.  Specifically, in this example, the

11   video streams have time lines modified by factors of 0.5, 1.0,

12   and 2.0."

13           Okay.  So he speeds them up.  His goal of Gupta is to

14   speed up and slow down for playback, so he gives you different

15   streams with different speeds.  And one speed he says there is

16   half speed; one speed is normal speed, 1.0, one times normal

17   speed; and 2.0.

18           And he goes on to say, "For each speed factor, there

19   is a 'low' bandwidth video stream having a relatively low

20   quality and a 'high' bandwidth video stream having a relatively

21   high quality."

22           So he specifically is -- and if you take the example

23   of his one times bandwidth -- his one times speed, rather -- so

24   that's normal speed -- he's giving you a high-bandwidth version

25   of that and a low-bandwidth version of that.

1          The applicant then says in the next paragraph -- so

2     now they're going to take a crack at distinguishing Gupta.  And

3     they say, "As can be seen, Gupta is directed to a system that

4     stores multiple 'speed' versions of the audio and video content

5     for playback at different speeds."

6          And here's the key sentence:  "This is completely

7     different than Applicant's invention where the video is

8     switched from one stream to a completely different stream

9     without any alterations to the audio or video."

10         Now, Gupta is talking about having a stream at normal

11    speed with a high resolution and a low resolution.  They're

12    saying, "That's not us because that's altering the audio-video.

13    What we do is something different."

14         Now, they made that statement in the prosecution

15    history, and this response led to allowance of these claims.

16    This was the distinction they made to get the claims allowed.

17         So having made that distinction and pointed out that

18    they don't make any alterations to the audio and video such as

19    the high and low resolution of Gupta, they can't come back now

20    and say that their claim is now broad enough to capture exactly

21    that.  That's exactly what they distinguished over.

22         THE COURT:  And is this the what's called file wrapper

23    estoppel?

24         MR. PAVANE:  Yes.

25         THE COURT:  Or is that a --

1          MR. PAVANE:  This is right out of -- the file history

2     is basically all the back and forth between the applicant for

3     patent and the patent office leading to issuance of the patent.

4          THE COURT:  But your argument is they're estopped from

5     asserting something --

6          MR. PAVANE:  Yes, yes.

7          THE COURT:  -- different than they asserted to the

8     examiner to allow -- to cause -- or at least an argument they

9     used to cause the patent to issue.

10         MR. PAVANE:  That's correct.  You can't distinguish

11    art during prosecution and say, "We don't do this," and then

12    when you come back and you have your patent and you see

13    somebody you want to capture for infringement say, "Well, our

14    claim covers that."  You can't do that.

15         THE COURT:  Well, are you saying that the part then

16    where it says -- this is the sentence you said was the critical

17    one:  "This is completely different than Applicant's invention

18    where the video is switched from one stream to a completely

19    different stream without any alterations to the video or

20    audio."

21         That's where you're arguing that there are -- the

22    patent intends to -- or the claim should be for different

23    points of view?

24         MR. PAVANE:  Yes.  Well, it certainly can't capture

25    different resolutions.  And we believe the only thing that's

1   disclosed is --

2           THE COURT:  Can or cannot?

3           MR. PAVANE:  Cannot capture different resolutions.

4           THE COURT:  And that's because of the earlier

5   statement at the bottom of the carryover paragraph on 131 where

6   it says, "For each speed factor" -- well --

7           MR. PAVANE:  Yes.

8           THE COURT:  Where it says that -- oh.  Well, they talk

9   about low bandwidth for a low quality; high bandwidth for high

10  quality.  And then two sentences later they say, "This is

11  completely different than Applicant's invention."

12          MR. PAVANE:  Right.

13          THE COURT:  That's your point.

14          MR. PAVANE:  Yes.

15          And I would also direct you to the end of this

16  paragraph of the applicant's comments where they make the point

17  at the very end, the last -- I think it's the last sentence --

18  last two sentences.  It starts five lines from the bottom of

19  the paragraph:  "Applicant's invention does not contain these

20  limitations and, in fact, overcomes the limitations of Gupta

21  and other prior art streaming methods by allowing the user to

22  smoothly switch views of a streaming broadcast without

23  interruption or repetition."

24          So I think, at the very least, it's extremely clear

25  when you read this that the applicant was saying, "Hey, we're

1    not doing something like this different resolution of, for

2    example, the one times speed stream where he has a high and a

3    low.  We're having video where we're giving you video that has

4    not been altered.  It's different camera angles, but the video

5    itself is not at each -- each camera is not being altered in

6    any way.  We're not modifying those signals."

7            And that's how they just told the examiner they were

8    different from Gupta.  And that led to allowance of the patent.

9            THE COURT:  Do I get to this only if I find the claim

10   terms ambiguous, or do I get to this as a matter of estoppel

11   because that is something I consider in light of -- well, we

12   talked about this at the very beginning.

13           But I include this in my analysis even if the claim

14   language may be unambiguous?  I have to look at terms of how it

15   was used during the prosecution history?

16           MR. PAVANE:  Absolutely.  You absolutely have to do

17   that, and for the very reason I mentioned.  You know, the case

18   law is, for the most part, practical here.  And it's saying,

19   "Look.  If you're going to distinguish art and tell the world

20   that this is not your invention and this is why you're

21   patentable, we're not going to let you come back and then when

22   you're in a litigation to take a different interpretation that

23   recaptures that same subject matter."  You just can't do that.

24           And, of course, as I think your Honor would agree, it

25   does not make sense to allow that.  And that's where the whole

 1  concept of prosecution history estoppel or file wrapper

 2  estoppel evolved from.

 3          THE COURT:  Okay.  All right.

 4          MR. PAVANE:  The only other point I wanted to make is

 5  on the provisional, just to go back -- I think I made this

 6  point, but my co-counsel is urging me to make it clearer --

 7  is -- and I think your Honor said is the point is that you can

 8  only go back to the provisional to avoid prior art for whatever

 9  is disclosed in there.

10          So if they want to go back -- and they are.  They're

11  claiming that their claims, their current claims -- they've put

12  this in their infringement contentions -- their current claims

13  are entitled to the filing date of the provisional, that means

14  that whatever they're claiming now has to be supported by that

15  provisional.  Otherwise, they can't get that date for those

16  claims.

17          And the provisional, again, only discusses the

18  different points of view, consistent with everything else your

19  Honor has seen.

20          THE COURT:  Is the provisional in the joint appendix?

21          MR. PAVANE:  Yes, it is, your Honor.  And it's I think

22  at 1306, I believe.  I believe it starts on page 1306 or 1305.

23  If you flip there, you'll see it.

24      (Counsel conferring.)

25          MR. SCHLATNER:  To the extent we have cites from 1311

1    in the brief.

2              MR. PAVANE:  Here it is.

3              So the actual provisional text starts on 1308, your

4    Honor.

5              MR. SCHLATNER:  Through 1312, I believe.

6              MR. PAVANE:  Yes, that's correct.

7              THE COURT:  Okay.

8              MR. PAVANE:  I'm done, your Honor.

9              THE COURT:  All right.

10             MR. PAVANE:  Thank you.

11             THE COURT:  Mr. Hosteny, any additional comments on

12   this, or should we move to the next one?  And I'm not --

13   nobody's waiving anything by not.

14             MR. HOSTENY:  No, we should.

15             THE COURT:  I just recognize that we need to move it

16   along.

17             MR. HOSTENY:  We should deal with Gupta because

18   it's --

19             THE COURT:  Go ahead.

20             MR. HOSTENY:  -- I don't agree.  And it's a bit --

21   it's a little bit ugly.  Okay.  Let me go back to the document

22   camera here.

23             Okay.  Here is the --

24             THE COURT:  Yeah, I think you've got to switch to the

25   ELMO function at this point.

1        MR. HOSTENY:  Yeah, I thought I did.  Document camera.

2  Back.  It doesn't want to do it now.

3        THE COURT:  Not enough bandwidth.

4        MR. HOSTENY:  Right.  Not enough bandwidth, right.

5        The examiner in his office action -- that's JA144 --

6  I'm going to move to the side here.  I'll come over here while

7  Art can play with that.

8        Got it?  Okay.

9        THE COURT:  So JA144.

10        MR. HOSTENY:  JA144.  Here it is here.  I've done some

11  highlighting on it, obviously.

12        THE COURT:  Okay.

13        MR. HOSTENY:  The examiner says that all of the

14  claims -- these are basically all of the claims pending in the

15  application -- are rejected under 102, meaning that they were

16  anticipated.  Okay?

17        THE COURT:  Okay.

18        MR. HOSTENY:  That list includes claims 9, 48, and 74.

19        The examiner's job if he says a claim is anticipated

20  is to say if the claim has elements A, B, and C, he's supposed

21  to say, "Gupta shows A; Gupta shows B; Gupta shows C."  In

22  other words, he has to give a basis for his conclusion.

23        When you go to the succeeding pages, you will see that

24  he addresses each claim -- next page has got 4, 5, 8.  Next

25  page, no claim 9.  There's no discussion of why claim 9 is

1    anticipated.

2    The same is true with respect to claim 48.  No

3    discussion of why 48 is anticipated.  No discussion of why 74

4    is anticipated.  So he leaves those out of his anticipation

5    discussion.

6    Then you go down to the bottom.  And he says, "Gupta

7    fails to disclose each video file corresponding to a different

8    point of view of the events."  Okay?

9    THE COURT:  Where are you at on that one?

10   MR. HOSTENY:  I'm down at the bottom of the page.

11   THE COURT:  On other rejections?

12   MR. HOSTENY:  Yeah, where he says --

13   THE COURT:  Well, what page?

14   MR. HOSTENY:  Page 147, JA147.

15   THE COURT:  Okay.

16   MR. HOSTENY:  And he says -- not the bottom paragraph,

17   but the next paragraph up -- "Gupta fails to disclose each

18   video file corresponding to a different point of view of the

19   event."  Okay?

20   What he is saying is that 8, 48, and 74 aren't

21   anticipated.  He mistakenly included them in his initial list

22   back on page JA144, but he gave no grounds for anticipation on

23   the succeeding pages.

24   Then he comes down --

25   THE COURT:  8, 48, and 74?  Or 9, 48?

1          MR. HOSTENY:  9, 48, and 74.

2          THE COURT:  All right.

3          MR. HOSTENY:  I apologize if I misspoke.

4          THE COURT:  9, 48 and 74.

5          MR. HOSTENY:  Yeah, it should be 9.

6          THE COURT:  So all right.

7          MR. HOSTENY:  9, 48, and 74.

8          THE COURT:  Okay.

9          MR. HOSTENY:  Then he makes the positive statement at

10  JA147 that with respect to these three claims, Gupta does not

11  show a different point of view.

12          THE COURT:  And where does he say that?

13          MR. HOSTENY:  And that is at the bottom -- near the

14  bottom of JA147.

15          THE COURT:  I just -- point it out on your -- on the

16  ELMO --

17          MR. HOSTENY:  Right --

18          THE COURT:  -- where you're reading.

19          MR. HOSTENY:  Right here, where I have the pen pointed

20  to, where it says, "Gupta fails to disclose" --

21          THE COURT:  "To disclose each" --

22          MR. HOSTENY:  -- "each video file corresponding to a

23  different point of view of the event."

24          THE COURT:  Okay.

25          MR. HOSTENY:  And his prior paragraph refers to

1    claims 9, 48, and 74.  Okay?

2           So what he did was there's a little goof here.  He

3    shouldn't have included claims 9, 48, and 74 in his discussion

4    of anticipation because he doesn't discuss them.  He discusses

5    them based on a 103 obviousness rejection, and he makes the

6    positive assertion that Gupta does not show different points of

7    view.  What he is saying is is that Gupta doesn't anticipate 9,

8    48, or 74 because it lacks a limitation of those claims,

9    different points of view.

10          Now, keep in mind a disclaimer has to be clear and

11   unmistakable.

12          If the inventors wanted to avoid Gupta, the logical

13   way, given Mr. Pavane's argument, to do it would be to amend

14   all the anticipated claims, say:  "Mr. Examiner, you said Gupta

15   doesn't show a different point of view.  We've amended all the

16   anticipated claims to recite a different point of view.

17   Therefore, we take away the Gupta reference.  We're good to go.

18   Our claims should issue."

19          That would be a disavowal.  That is not what they did.

20   That is exactly not what they did.

21          What they did instead was they said Gupta shows

22   something different.  Gupta stores multiple versions of

23   something, each with a different speed.

24          THE COURT:  What page -- this is of your PowerPoint?

25          MR. HOSTENY:  This is page JA131.  I quibble with the

1    quote of this.

2            THE COURT:  Oh.  But I think you're referring -- this

3    is on your PowerPoint.

4            MR. HOSTENY:  Yes.

5            THE COURT:  What page is that?

6            MR. HOSTENY:  Yeah, that is Slide 23.

7            THE COURT:  All right.  I'm there.

8            MR. HOSTENY:  And I quibble a bit because I don't

9    think this was fully quoted in the defendant's brief.  And I've

10   got it quoted here and highlighted.

11           The first thing I point to is this blue sentence:

12   "Gupta is directed to a system that stores multiple 'speed'

13   versions of the audio and video."

14           Well, what do the inventors want to do here?  They

15   want to switch in a live event from one video signal about that

16   live event to another video signal about the live event.

17           Gupta can't do that.  And that's what they're saying

18   in this paragraph, because they continue down, they make the

19   comment in red, and they say, "Gupta requires that 'the

20   multimedia player repeats ... the multimedia content.'"

21           In other words, if I shift my bit rate from one to

22   another on the basketball game, I'm not switching at a key

23   frame; I'm going back to the beginning of the game at a

24   different -- to display it at a different speed, or a different

25   quarter of the game.  But I am not smoothly switching at a key

1    frame from one video signal to another video signal.

2            Gupta stores them all, and what it has to do is
3    repeat.  Okay?

4            So they didn't amend their claims.  They didn't change
5    the claims to all recite different points of view.  They simply
6    said Gupta is different from the invention and went from there.
7    There's no clear disavowal here.

8            Then when you go to the specification of the patent,
9    it refers -- this is Column 3, lines -- about lines 20 to 24:
10   "so as to switch between audio signals, streaming, upon
11   switching, a second audio signal which is different from the
12   first audio signal without altering the first video signal.

13           "Advantageous embodiments of the present invention are
14   claimed in the attached dependent claims."

15           Claim 14 is one of those dependent claims.  It's the
16   only one that recites a "point of view."

17           And I respectfully disagree with Mr. Pavane in his
18   characterization of that claim because what claim 14 says --
19   well, claim 12 says you have "a plurality of audio and video
20   sources."  You have "a first audio file and a first video
21   file."

22           Then claim 14 says, "the plurality of audio and video
23   source signals is a single audio source and a plurality of
24   video sources, each video signal corresponding to a different
25   point of view."

1          So when they want to claim a "point of view," as

2     Mr. Pavane said, the inventors knew what they were talking

3     about.  The inventors knew what they were talking about.

4          And when they described Gupta in the file history,

5     they didn't amend to get around it.  And when they're talking

6     about different points of view, they refer to dependent claims.

7     And they have a dependent claim to that effect.

8          The bottom line, there is no clear disavowal of

9     "different point of view" by the file history.  That's it.

10          THE COURT:  Okay.

11          MR. PAVANE:  I'd like to respond briefly.

12          THE COURT:  Sure.

13          MR. PAVANE:  Okay.  Firstly, I'm hearing -- this is a

14     new argument I haven't heard before that when the examiner

15     rejected all the claims as anticipated, he made a mistake.

16          Well, couple of things on that.  Firstly, the

17     applicant who responded to the examiner's rejection never took

18     the position that this was a mistake.  They didn't say that.

19          And when you look at the question of prosecution, I

20     called Mr. Hosteny's argument the "woulda coulda shoulda"

21     argument.  They could have amended their claims to do this.

22     They -- it was really a mistake, but they didn't point it out.

23          You have to look at what's in the file history.  The

24     exam -- the applicant is confined by what he says in the file

25     history.  The examiner rejected the claims as anticipated.

1    Never said it was a mistake, and they responded to all those

2    rejections.

3           Secondly, if you look -- Mr. Hosteny pointed out that

4    there was no separate discussion of claim I think it was 9 and

5    48.  But if you look at that office action, at page JA147, at

6    the very top, he does talk separately about claim 74.  So to

7    say he made a mistake, okay.  He didn't talk about 9 and 48,

8    but he does talk about 70 to 77, which obviously includes 74.

9           So how Mr. Hosteny concludes that's necessarily a

10   mistake I don't know, especially when you don't have the

11   applicant saying it's a mistake.

12          But more to the point, the point I don't get is that

13   let's remember that these claims didn't recite "different point

14   of view"; these claims were broader.  These claims cited just a

15   view.  So right?  Not a view, a video signal.  Excuse me.

16   Right?

17          So the examiner is saying, "You've got this broad

18   recitation of a video signal.  That can encompass anything.  So

19   in my view, Gupta teaches that and anticipates all these

20   claims.  It could be a 'different point of view'; it could be

21   this.  Who knows what it is.  So it's anticipated."  And he was

22   correct to do that.

23          When the applicant came back and made -- and

24   Mr. Hosteny points to other parts of the discussion of their --

25   where they're distinguished on page 1 -- 131, right below where

1    we were just looking, when they talk about the paragraph that

2    starts, "As can be seen by Gupta," Mr. Hosteny points to other

3    parts of that where he -- where they distinguish.

4           And, yes, I agree they made a number of distinctions

5    over Gupta.  I don't dispute that.  But the key one that I'm

6    pointing to is the one where if Gupta's got a one-time speed,

7    1.0 speed, which is normal speed, and he's got a high and a low

8    resolution for that, as he says he does, and they come back and

9    say, "That's not us.  We're different because we don't alter

10   the audio and video signals," that's a clear statement of what

11   we're not.

12          We are not a system that adjusts the resolution of the

13   video signals.  We don't do that.  The fact that they may have

14   had other grounds to distinguish doesn't help them here.  The

15   case law is extremely clear on that.

16          Nor does it help them that later on, just down the

17   page there, that the examiner in the actual office action --

18   and that's at -- on page -- going back to JA147.  Right after

19   he -- and rejects all the claims as anticipated, he then does

20   reject claims 9, 48, and 74 as obvious from Gupta.

21          But as we pointed out in our brief, I believe in a

22   footnote at the bottom of page 5 of our responsive claim

23   construction brief, we pointed out that -- and I'll just read

24   the footnote.  It says "That the Patent Office also rejected

25   claims 9, 48, and 74 as obvious over Gupta does not aid

 1   Plaintiff; Examiners are free to reject the same claims as both

 2   anticipated and obvious," and citing to a decision from the

 3   predecessor of the Court of Appeals for the Federal Circuit

 4   called the CCPA, or the Court of Customs and Patent Appeals.

 5           And one of the first acts, by the way, that the

 6   Federal Circuit did when it came into being in I think 1984 --

 7   I think it was a case called *In re South* -- is they adopted as

 8   precedent all of the decisions of the CCPA.  So --

 9           THE COURT:  Wouldn't the examiner have said

10   claims 9 -- on JA147.  Wouldn't -- why wouldn't he say,

11   "Claims 9, 48, and 74 are also rejected," added the word

12   "also"?  Maybe this is implying too much care on this.  But --

13           MR. PAVANE:  I think you're reading a lot into it.  I

14   mean, you know, I have no idea what was in the examiner's mind

15   when he did that.

16           THE COURT:  Right.

17           MR. PAVANE:  I'll be the first to confess that.  But I

18   do know what I read on the page, and I do know what they said

19   in distinguishing over Gupta.

20           THE COURT:  Right.

21           MR. PAVANE:  It doesn't really matter whether they had

22   to do it or didn't.  The case law is also very clear on that

23   when it comes to prosecution history estoppel.  It's not a

24   defense to an estoppel argument to say, "I didn't really have

25   to make that statement.  I had other grounds for distinguishing

1  over these claims."

2  THE COURT:  Is it a fair statement as to -- I

3  understand Mr. Hosteny's argument, and I think I understand

4  yours.  You're saying the inventor's got to live with what they

5  said.  And he's saying that the patent examiner didn't

6  necessarily -- at least a broad reading of all of this --

7  didn't necessarily reject claims 9, 48, and 74 as anticipated.

8  You're saying it doesn't really matter what the

9  examiner did given the statements of the inventor to try and

10 distinguish Gupta.

11 MR. PAVANE:  Yes.  But I -- again, I -- yes, your

12 Honor.  And I do think he rejected them because he says he's

13 rejected them.

14 THE COURT:  No, I understand that.  He says that, and

15 then Mr. Hosteny makes the argument why that may have been a

16 mistake given later statements.  If he rejected it as

17 anticipated, he probably should have said they're also rejected

18 as obvious.  But, you know, who knows.  This case is not going

19 to turn on whether an examiner included the word "also."

20 MR. PAVANE:  I could probably find you many cases --

21 if you ask me to go look through some patent filings, I'll find

22 you other cases where the examiner rejects claims on multiple

23 grounds and doesn't use the word "also."

24 THE COURT:  Okay.

25 MR. PAVANE:  I can assure you of that.

1              THE COURT:  I have no doubt that that's the case.  But

2      I think I get both arguments on this.

3              MR. PAVANE:  The only other point I wanted to make

4      real quickly is on the dependent claim thing about 12 and 14,

5      and I beat that to death.

6              But even what Mr. Hosteny read to you, he correctly

7      read that there is another limitation in claim 14, namely, that

8      they're restricting it to a single audio signal and a plurality

9      of video, which is not found in claim 12.  So there's a further

10     limitation in claim 14, and that vitiates the claim

11     differentiation argument.

12             Thank you.

13             THE COURT:  Okay.  All right.  Let's go to the next

14     one.

15             I don't know that we're -- well, here's --

16             Off the record for a minute, please.

17         (Off-the-record discussion.)

18             THE COURT:  Let's go back on the record.

19             Where are we going now, Mr. Hosteny?

20             MR. HOSTENY:  We're going to do -- in our slide

21     presentation, it's 29, "establishing separate sessions."

22             THE COURT:  Okay.

23             MR. HOSTENY:  And then we were going to go to one

24     other point, the last one.  It is the last one, "without using

25     bandwidth of the streaming session."  That's our Slide 42.

1          THE COURT:  Okay.  Very good.

2          MR. PAVANE:  And then if we have time, we'll be going

3    into "controlling on the server," but only if there's time.

4          THE COURT:  Okay.  Go ahead.

5          MR. HOSTENY:  "Establishing separate sessions," I

6    think it's fairly straightforward.  The specification says that

7    "every recipient is sent his own stream of data," and "separate

8    stream" means unicast.

9          THE COURT:  What is unicast?

10         MR. HOSTENY:  Unicast means separate stream.  It means

11   a stream per user.

12         THE COURT:  All right.

13         MR. HOSTENY:  Not multiple streams per user; not the

14   same stream to multiple users.  It means one stream per user.

15   That's how this thing becomes efficient, because it saves

16   bandwidth.

17         There's a discussion in the specification "in the

18   unicasting model, every recipient is sent his own stream of

19   data," Column 7, lines 14 to 15, yada, yada, yada.

20         THE COURT:  Slow down.

21         MR. HOSTENY:  Sorry.

22         The specification says, "in the unicasting model,

23   every recipient is sent his own stream of data," Column 7,

24   lines 14 to 15.

25         There's also another point.  Part of the history of

1    this patent is that it had a parent patent reflected on the

2    cover of the '236.  The '236 patent, which we're taking about

3    today, is a continuation of a patent that issued as the '244,

4    filed in 2001.

5            THE COURT:  That's the paragraph 63?

6            MR. HOSTENY:  Yes, correct.

7            THE COURT:  All right.

8            MR. HOSTENY:  And the '244, during the prosecution of

9    it, there was an appeal taken.  So that appeal is part of the

10   file history as well.

11           And the file history says -- and this is page JA611 in

12   the joint appendix.  It says, "In response to this, Applicants

13   note that the language of feature b), i.e. 'the streaming

14   server establishing separate sessions ... sending each user a

15   separate stream' is sufficient enough for the person skilled in

16   the art to understand that a unicast model is meant by those

17   words."

18           Okay?

19           THE COURT:  Okay.  Where are you?  I'm on 611.

20           MR. HOSTENY:  On 611, the last -- the partial

21   paragraph at the bottom of the page.  Let me put it up on the

22   ELMO.

23           It's -- sorry about the beat-up finger.  But it's

24   these two.

25           THE COURT:  Got it.

1          MR. HOSTENY:  These three or four lines right there.

2          So the inventors have said the same thing twice, that

3     "a separate stream" means unicast.

4          And the defendants want what they call "a new,

5     discrete network communication."

6          "Discrete" doesn't appear anywhere in the '236 patent.

7     The word "separate" does.  It's in all these claims that we've

8     listed at the bottom of the page here, 12, 16, 17, 18, 22, and

9     40, not in claim 26, I guess.

10         So I think it's pretty straightforward that in our

11    construction, "separate session" means "establishing a stream,

12    preferably in unicast, that is separate from other

13    communications of the server side with other clients."

14         And I don't know what "new, discrete network

15    communication" means.  It may mean something like this, which I

16    just sketched out.

17         I think where the defendants are headed on one of

18    their arguments, I think it's a non-infringement position.  You

19    remember the client on the left and the server on the right

20    communicate through the cloud.

21         The path through that cloud is changeable.  That's the

22    idea of the Internet.  It's not a -- like a telephone circuit

23    where there's a single defined, discrete connection between one

24    telephone and another distant telephone.

25         This server and this client can communicate over

1    multiple paths, and lots of different computers can be

2    involved.  There's called content delivery networks.  There's

3    load sharing, different files with the same name, maybe on

4    different servers.

5              "Single discrete network connection" to me implies

6    that what the defendants want is it's got to be path 1 or it's

7    got to be path 2, but it can't change once it's inside the

8    cloud.  And that's wrong.  That's just totally at odds with

9    what the Internet is about because the whole idea of the

10   Internet is a packet switch network where packets of data can

11   get from the origin to the endpoint by any one of a number of

12   different paths and where a lot of different computers can be

13   involved.  The complexity is astonishing on what goes on inside

14   the cloud.

15             But "single discrete network connection" or "single

16   discrete path" doesn't mean anything for the '236 patent.

17             Thank you.

18             MR. PAVANE:  Okay.  I'll try to be equally brief.

19   Thank you.

20             THE COURT:  All right.

21             MR. PAVANE:  Can you switch that over to my --

22             MR. HOSTENY:  Oh, sorry.

23             MR. PAVANE:  That's all right.  Thank you.

24        (Counsel conferring.)

25             MR. PAVANE:  Okay.  Thanks.

1        Okay.  So I'm on Slide 31.  I just wanted to put up

2   the term that was in dispute, the claims it appears in, 16, 17,

3   18, and 22 and the different construction.

4        So the main -- as I see it, the main dispute we have

5   is it's -- we both agree on certain aspects of this, that it is

6   the connection that's separate from every other connection.  I

7   agree with that part of Cascades' construction.  I don't have

8   any problem with that.

9        I do want to refer your Honor -- we were looking -- I

10  believe Mr. Hosteny directed you to JA611 and pointed out that

11  that part of the file history is also relevant here.  And I --

12  I concur.

13       So if you look at that same paragraph Mr. Hosteny

14  directed your Honor to at the bottom, the partial paragraph at

15  the bottom of page JA611, it says that "In response to this,

16  Appellants note that the language of feature b), 'the streaming

17  server establishing separate sessions ... sending each user a

18  separate stream'" -- so that's the exact language we're dealing

19  with here -- "is sufficient enough for the person skilled in

20  the art to understand that a unicast model is meant by those

21  words."

22       So let's first stop right there.  If that's enough for

23  a person of ordinary skill in the art to understand that, then

24  we don't need to say both "preferably in unicast" and

25  "establishing separate sessions" because, according to this

1   file, they mean the same thing.

2          And, frankly, throwing in "unicast" is just going to

3   confuse the jury.  We've established what the terms mean.  We

4   all agree what it means.

5          The second part is also highly relevant, the next

6   sentence.  It says, "In particular, the person skilled in the

7   art would understand that a 'session' is a dedicated network

8   connection between a user and a server, where exchanges of

9   network packets -- specific to that connection -- occur between

10  the server and the user."

11         And the point we're making here is that the connection

12  that's established -- once there's a connection established

13  between the server and the user, that is a dedicated connection

14  that remains open for the duration of the viewing of the event.

15         And if you look in the -- and we cited these portions

16  in our brief.  If you look in the patent, the whole point of

17  the patent is to, as Mr. Hosteny has pointed out, avoid the

18  problem that happens when you switch over from one video signal

19  to another video signal.  You don't want to have these delays.

20         And the way that the patent talks about solving those

21  problems is precisely by establishing these connections that

22  remain live for the duration of the event.  And I would direct

23  you -- it's discussed in our brief, but there's just one part

24  of the spec I will bring to your attention at Column 15,

25  lines 42 to 57.

1    And this is -- discusses the specific implementation.

2    But you'll see the same language in our briefs talking

3    generally about how the system works.

4    But it points out that -- at the very -- at line 42,

5    it says, "Once a stable network connection has been

6    established" -- this is Column 15, line 42 -- "a streaming

7    session on the server side comprises the following steps."  And

8    then it goes through the steps of how you get all the

9    information for the video signal and the audio signal over to

10   the user.

11   And then at line 57, it says, "As soon as the last

12   iteration is terminated" -- meaning the last little bit of

13   information coming over of the signal -- "the connection is

14   closed."

15   So the dedicated network connection remains open as

16   long as you stream.  And as the background points out -- or the

17   summary, rather, points out while you're switching, so you

18   don't get these delays, and it closes when the last piece comes

19   over.  That's what a dedicated -- that's what it means to

20   establish separate sessions.  A session, as that portion of the

21   file history indicated, means a dedicated network connection.

22   And that, indeed, again, is the whole point of the

23   invention.  That's how the invention works.

24   Thank you, your Honor.

25   THE COURT:  Okay.  All right.

1    MR. HOSTENY:  Very briefly, your Honor, with respect

2  to that last portion quoted by -- what I'm having a lot of

3  trouble with is "discrete."  I don't understand the

4  justification for that word.

5        Also, if I look at Column 15, lines 40 to about 55,

6  those steps are preliminary to the streaming, not the streaming

7  itself.

8        THE COURT:  What's the difference between "new" and

9  "discrete"?

10    MR. HOSTENY:  Pardon?

11    THE COURT:  "Discrete" means separate, correct?

12    MR. PAVANE:  I was going to say I'll accept "separate"

13  rather than "discrete" if that's a problem for Mr. Hosteny.

14  They used "separate" in theirs.  That's fine with us.

15    MR. HOSTENY:  Yeah.  And the other problem we had with

16  their definition -- I just want to point it out.  I'm not going

17  to spend time on it -- is the addition of "continues for the

18  duration of a separate stream."  I don't think that's part of

19  the claim.

20    THE COURT:  Okay.

21    MR. HOSTENY:  With that, I think we're ready to go to

22  the other point we were going to discuss.

23    THE COURT:  Okay.

24    (Counsel conferring.)

25    MR. HOSTENY:  Actually, the last.

1      THE COURT:  What's your slide number?

2      MR. HOSTENY:  That is 42, your Honor.

3      THE COURT:  Okay.

4      MR. HOSTENY:  And this is claim 26, step (a).  We

5  initiate "a streaming session with a server having a client

6  side and a server side," and "the streaming session

7  encapsulates a plurality of multimedia files that are for

8  acknowledgment by the client without using the bandwidth of the

9  streaming session."

10     Way I'm reading that step is exactly what it says.

11  The bandwidth of the streaming session is not used.  That is

12  different from the bandwidth of the connection.

13     But the defendant's construction is "without using any

14  bandwidth of the connection," and they say, "used for streaming

15  the multimedia files."  I just -- I think their construction is

16  ambiguous because step (a) says "without using the bandwidth of

17  the streaming session," not "without using the bandwidth of the

18  connection."

19     There's more bandwidth in the connection than that

20  which is used for the streaming session, and that's this

21  business of the server telling the client -- one side telling

22  the other -- "Here's what I have available for you to watch or

23  listen to.  Here are the alternatives."

24     THE COURT:  Point to Figure 1 and show me where the

25  extra bandwidth is being used for a connection --

1          MR. HOSTENY:  Oh.

2          THE COURT:  -- because that seems to be the --

3          MR. HOSTENY:  Yeah, I know where you're --

4          MR. PAVANE:  Figure 2, I think.

5          MR. HOSTENY:  Figure 2.

6          THE COURT:  Figure 2.  I'm sorry.  Figure 2.  You're

7     correct.

8          MR. HOSTENY:  Yeah, we're back to Figure 2.  I would

9     say that is the double-sided arrow 16.

10          THE COURT:  So your contention is that's what the

11     word -- that's where the connection that's in the defendant's

12     construction is --

13          MR. HOSTENY:  Well, the connection is both, but the

14     streaming is 18.

15          THE COURT:  Right.

16          MR. HOSTENY:  The exchange of information is 16.

17     Okay?  16 is not using the bandwidth of the -- is not avoiding

18     use of the bandwidth of the connection; it's avoiding use of

19     the bandwidth of the streaming session, i.e., 18.  I'm -- you

20     know, and I'm not a hundred percent sure that this is going to

21     be a significant point down the road, but it was one that we

22     decided, for better or worse, that we included in our list.

23          THE COURT:  Okay.

24          MR. HOSTENY:  And then on our next slide, we say

25     information -- there is information about a stream contained in

1  a file, referred to at Column 5, lines 10 to 25, and Column 11.

2          I think there's an argument about this claim -- about

3  this being indefinite.  I don't agree with that.  In any event,

4  I think indefiniteness is an issue for a later day.

5          So I think the preferable definition would be ours,

6  "without using any bandwidth used for streaming the multimedia

7  files," as opposed to the defendant's construction, "without

8  using any bandwidth of the connection."  That would make no

9  sense.

10          I think that's it on that one.

11          MR. PAVANE:  Can you switch that over again for me?

12          MR. HOSTENY:  Oh, I apologize.

13          MR. PAVANE:  I must confess, your Honor, I'm a little

14  confused now because what Mr. Hosteny just said I think is what

15  we're saying.  But --

16          THE COURT:  Well, there's a difference in words, of

17  course.  That's why we're here.

18          MR. PAVANE:  Yeah, but I think -- you know, I was

19  looking at Cascades' -- Mr. Hosteny's claim construction brief.

20  And they say here in talking about the two constructions --

21  they say, "In practice" -- and, again, let's look at Figure 2.

22          Can we -- I have it, actually, at the beginning.

23          MR. HOSTENY:  I can put it back up.

24          THE COURT:  I think it's on your PowerPoint if you've

25  got it.

1          MR. PAVANE:  Yeah.  I think he's got it up there.

2  It's fine.  I'd have to go all the way back, and I'm not an

3  expert in this.

4          THE COURT:  It's your Slide 2.

5          MR. PAVANE:  Okay.  So it would be --

6          THE COURT:  Or no.  That's Cascades' Slide 2.

7          MR. PAVANE:  Yeah, we can use theirs.  It's fine,

8  either one.

9          The point that we were making is -- okay -- 18 is

10  where the -- I didn't put it up on the screen, your Honor.

11          MR. HOSTENY:  Hang on.  We'll be there in a moment.

12          MR. PAVANE:  Okay.

13          MR. HOSTENY:  Okay.

14          THE COURT:  All right.

15          MR. PAVANE:  Okay.  18 is where, as we discussed right

16  at the beginning, the streaming occurs.  That's where the

17  stream goes, that line 18.  It's the one-way line.

18          THE COURT:  Right.

19          MR. PAVANE:  Okay.  And the line above that, the 16,

20  was the two-way communication for other information.

21          THE COURT:  Right.

22          MR. PAVANE:  And the claim is talking about other

23  information.  It's talking about acknowledging certain

24  information.  But it's not the streaming that talks about

25  without using the bandwidth.  And I think that's something we

1    should all recognize, that the claim is not talking about the

2    streaming; it's talking about acknowledgment of information

3    from the server without using the bandwidth of the streaming

4    session.

5             So as I understand that -- excuse me just one second,

6    sir.

7             Yeah.  So, for example, in claim 26, it says "wherein,

8    the streaming session encapsulates a plurality of multimedia

9    files that are for acknowledgment by the client without using

10   the bandwidth of the streaming session."

11            So, again, I would understand that to mean, looking at

12   Figure 2, that says that, okay.  The bandwidth -- the

13   bandwidth -- again, don't forget the bandwidth is not how much

14   data is going down; it's the pipe.  So the bandwidth of that

15   streaming session is whatever line 18 can handle.  The

16   bandwidth of the two-way communication is whatever line 16 can

17   handle.

18            So "without using the bandwidth of the streaming

19   session" clearly means that we're not going to muck up the

20   communication between the streaming server No. 11 and the

21   streaming client No. 17 with other stuff going back and forth.

22   We're going to use that separate connection, that separate

23   bandwidth 16, for that purpose.

24            And, indeed, that's confirmed not only by the plain

25   language, but also by those arrows.  There's no two-way

1   communication on line 18.  18 is solely a one-way communication

2   for streaming the video.

3           The line above it is where the client can communicate

4   back to the client -- to the server side, as Mr. Hosteny

5   pointed out in his opening.  So --

6           THE COURT:  Well, are you both -- do you both agree

7   that the words "without using bandwidth of the streaming

8   session," which is the claim language, refers to line 18?

9           MR. PAVANE:  I think so.

10          THE COURT:  Then does it matter that you're using

11  different language here if you're both referring to claim -- to

12  line 18?

13          MR. PAVANE:  The distinction, I think, does it -- no.

14  The answer is that, you know, line 18 won't be part of the

15  claim construction.  So I think that the language has to be

16  clear so when the jury sees the construction, they'll

17  understand what that means.

18          If we wanted to put in, you know, something that says,

19  i.e., the bandwidth used for streaming along 18 is not used for

20  this acknowledgment as part of the construction or something

21  that makes that clear, I'm fine with that because that is what

22  we're saying.

23          THE COURT:  Well, can't you simply say --

24          MR. PAVANE:  And I think he's --

25          THE COURT:  Can't you simply say it's the bandwidth

 1    used to communicate between the streaming server and the

 2    streaming client?  That's what you both agree it means.

 3              MR. HOSTENY:  I would take -- yeah, I would take out

 4    the words "of the connection."

 5              THE COURT:  Well, that's -- I --

 6              MR. HOSTENY:  Yeah.

 7              THE COURT:  I don't know -- "of the connection" is in

 8    your construction on the -- on Big Ten's side.  But I don't

 9    know that you're talking about different things.

10              MR. HOSTENY:  No, I'm not.

11              MR. PAVANE:  I think what you just said was fine.  You

12    want to say that one more time?

13              THE COURT:  Well, just a construction that says that

14    the words "without using bandwidth of the streaming session"

15    refers to -- "the streaming session" refers to the bandwidth

16    between the streaming server and the streaming client, which is

17    what 18 is.

18              MR. PAVANE:  I'm good with that.

19              THE COURT:  If you can capture what I just said into

20    an agreement, that's great.

21              MR. HOSTENY:  Yeah, yeah.  I think that's probably

22    okay.  I mean, my confusion -- my concern was the reference to

23    "of the connection."

24              THE COURT:  Right, because there's a -- that may imply

25    that you're --

1          MR. HOSTENY:  The whole thing.

2          THE COURT:  -- talking about Rule 16 -- or not Rule --

3     line 16 and line 18.

4          MR. HOSTENY:  Correct.

5          THE COURT:  And I think you're both agreeing you're

6     talking about line 18.

7          MR. HOSTENY:  Yeah.

8          MR. PAVANE:  Yes.

9          THE COURT:  And if you can put that in a form of

10    agreement on -- or withdraw this as a contested claim term, if

11    you can --

12         MR. HOSTENY:  Right.

13         THE COURT:  -- reach agreement on it, that's fine.

14         MR. HOSTENY:  Okay.  Okay.

15    Then I think --

16         MR. PAVANE:  We'll try to do that, yes.

17         THE COURT:  Okay.

18         MR. HOSTENY:  It's 12:14.

19         THE COURT:  Well, how about that.  Well, are there --

20    how do you want to proceed?

21         MR. PAVANE:  Here's what I would suggest.  We were not

22    ready at our side to say we don't want to necessarily come back

23    for further argument.

24         However, what we -- we -- as a further compromise, in

25    an effort to make everything simpler for everybody, what we

1    would be prepared to do is have your Honor look at the terms we

2    haven't discussed.  And if your Honor feels that it's --

3    there's something you want to hear further argument, we'd be

4    happy to come back --

5                THE COURT:  All right.

6                MR. PAVANE:  -- even though we're traveling from New

7    York.  It's fine.

8                If your Honor feels that you have all you need from

9    the briefs, we're fine with that too.

10               THE COURT:  Fair enough.

11               Well, I'm much -- I feel much more comfortable about

12   the presentation now, having heard what you've both given me

13   today.  It's very helpful on both sides.  The tutorial was

14   good, but it was not in concrete terms for me to -- I needed it

15   twice, and I've got it now twice, and this was all very

16   helpful.

17               I'll do that.  I'll look it over.  If I think I need

18   some help or argument on any particular claim terms, I'll

19   likely get you on the phone, and you can tell me whether these

20   are claim terms that are important or not or important enough

21   to require any view from you on having -- any need for you to

22   come in and talk about it.

23               What's the status of the case right now otherwise?

24               MR. PAVANE:  That was the next thing I wanted to bring

25   up.  I don't believe --

1    THE COURT:  Come on up to the podium.  Why don't you

2 both come up now.

3    MR. PAVANE:  Thank you.

4    I don't believe, your Honor, there is a schedule in

5 place for completion of fact discovery, expert discovery,

6 et cetera.  And I think we would like to have one put in place

7 and get this over and done with.

8    THE COURT:  All right.  And can that take -- I assume

9 the discovery can take place without a ruling from me on the

10 claim construction.

11    MR. HOSTENY:  Sure.

12    MR. PAVANE:  And has been.  I think we just need

13 cutoff dates.

14    THE COURT:  All right.  Have you talked about a

15 proposed cutoff date?

16    MR. PAVANE:  No.

17    MR. HOSTENY:  We haven't.

18    MR. PAVANE:  We'd like to do that.  I was going to

19 suggest exactly that, that you let us take a crack at coming up

20 with some dates and subject to your Honor's approval.

21    THE COURT:  Yeah.  Why don't you do that.  How much

22 time do you need to come up with that?  Do you want me to set

23 you for a status next week?

24    You can participate by phone, by the way.

25    MR. PAVANE:  Thank you, sir.

1          Yes, I think a week -- is a week okay?  I don't know.

2     Do you have to consult with anybody?

3          (Counsel conferring.)

4               MR. HOSTENY:  Can we make it two weeks instead of one?

5               THE COURT:  That's fine, as long as you can -- if it

6     gives you time to work out an agreement on a discovery

7     schedule, that's fine.

8               MR. HOSTENY:  Yeah.

9               MR. PAVANE:  Okay.  That's fine.

10              THE COURT:  So we'll set it for a status not next

11    week, but the week following.

12              MR. PAVANE:  Yes.

13              THE COURT:  We'll get a date for you.  It will be in a

14    minute order.  If that date is inconvenient, we'll change it,

15    that same week.  You know, if it's a Tuesday and that's not

16    good, we'll move it to a Wednesday or Thursday, but we're not

17    going to move it weeks hence.

18              MR. PAVANE:  I'm around all week, so that's fine.

19              MR. HOSTENY:  Good.  Okay.

20              THE COURT:  And no problem at all with anybody or all

21    of you participating by phone if you're traveling or in another

22    jurisdiction for a trial or a hearing or anything.  We can do

23    it that way, because all we're going to do is just put that in

24    place and then -- well, I'll see what you agree to and see if I

25    agree it's reasonable, and we'll just put it in place and talk

1    about anything else we need to talk about.

2                MR. PAVANE:  Thank you.

3                THE COURT:  Okay.  Good.  Anything else we need to

4    discuss today?

5                MR. HOSTENY:  I don't think so.

6                MR. PAVANE:  I don't think so, sir.

7                THE COURT:  All right.  Thank you all.  Thank your

8    clients for coming in too.

9                MULTIPLE COUNSEL:  Thank you, your Honor.

10               THE COURT:  All right.  Appreciate it.

11        (Concluded at 12:16 p.m.)

12                    C E R T I F I C A T E

13        I certify that the foregoing is a correct transcript of the

14   record of proceedings in the above-entitled matter.

15

16   /s/ LAURA R. RENKE                    April 27, 2015
     LAURA R. RENKE, CSR, RDR, CRR
17   Official Court Reporter

18

19

20

21

22

23

24

25